**Viola JERREL, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2740.**

Court of Appeals of Alaska.

May 14, 1993.

Rehearing Denied June 3, 1993.

William K. Walker, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

* Sitting by assignment made pursuant to article

## OPINION

BRYNER, Chief Judge.

Viola Jerrel was convicted, following a jury trial, of two counts of perjury, in violation of AS 11.56.200. Superior Court Judge Charles K. Cranston sentenced Jerrel to consecutive terms totalling three years with two years suspended. Jerrel thereafter filed an application for post-conviction relief, claiming ineffective assistance of counsel. Judge Cranston summarily dismissed the application. In this appeal, Jerrel challenges her conviction on various grounds, contends that her sentence is excessive, and claims that the superior court erred in summarily dismissing her application for post-conviction relief. We affirm.

## FACTS

In October of 1985, vandals spray-painted over a mural on the wall of a grocery store in Homer. Jerrel's son, Dan Jerrel, Jr., was arrested in connection with the crime. On January 20, 1986, Jerrel attended a bail hearing in her son's case at the Homer courthouse. Homer Police Officer William Walters transported Dan Jerrel to and from the courthouse for the hearing. After the hearing, Jerrel approached Walters and her son just outside the courthouse doors, as Walters led Dan Jerrel toward the patrol car for the return trip to jail. Jerrel conversed briefly with Walters; she then broke off contact and walked away from the courthouse. Walters led Dan Jerrel in the opposite direction to the patrol car and left.

Several weeks later, on February 13, 1986, Jerrel filed a criminal complaint purporting to charge Walters with fourth-degree assault, a misdemeanor. In the complaint, Jerrel alleged under oath that Walters placed her and her son Dan in fear of imminent physical injury by threatening "to get" Dan. According to the complaint, Walters uttered this threat to Jerrel outside the Homer courthouse immediately after the January 20 bail hearing.

IV, section 16 of the Alaska Constitution.

The Alaska State Troopers investigated Jerrel's complaint during the spring and summer of 1986. In the course of this investigation, the troopers learned that Walters, using a microcassette recorder that he carried on his person, had tape recorded the January 20 bail hearing and his ensuing encounter with Jerrel. According to Walters, he had turned on the recorder at the outset of the bail hearing and had not turned it off until he and Dan Jerrel were both seated in the patrol car. Physical analysis of the tape itself by the FBI confirmed this claim. A review of the recording disclosed that Walters had made no threats against Jerrel or her son.

On November 12, 1986, Jerrel's complaint against Walters was scheduled for a hearing in District Court to determine whether her charge of assault was supported by probable cause. The results of the troopers' investigation had not yet been disclosed to Jerrel, and she evidently remained unaware that Walters had recorded the events of January 20. At the hearing, Jerrel repeated under oath her allegation that Walters had threatened her son outside the Homer courthouse immediately after the January 20 bail hearing. In response, Walters took the stand and, in the course of his testimony, revealed that he had recorded the conversation.

The state subsequently indicted Jerrel, charging her with two counts of perjury:[1] one for her false statements in her February 13 criminal complaint, and the other for her false testimony at the November 12 probable cause hearing.

## DISMISSAL OF INDICTMENT

■ During the grand jury proceeding, Walters testified that he had spoken with Jerrel just outside the Homer courthouse doors as he and Dan Jerrel exited the building after the January 20, 1986, bail hearing. Walters stated that Jerrel then left, and he and Dan Jerrel walked to the patrol car. Walters denied making any threats to Jerrel. Walters further testified about re-

cording the encounter with Jerrel, stating that the entire conversation was recorded and that he did not turn his recorder off until "[a]fter I had gotten in the patrol car and prepared to leave the parking lot." Although the state relied on the recording to corroborate Walter's claim that no threats had been made, it did not introduce the FBI report dealing with the analysis of the tape. Deputy Magistrate Anna Creasy also testified that she recalled seeing Jerrel walk away from the courthouse in a different direction than Walters and Dan Jerrel.

Prior to trial, Jerrel moved to dismiss the indictment, claiming that the state had failed to present exculpatory evidence and had relied on perjured testimony. Specifically, Jerrel alleged that the state breached its duty of presenting exculpatory evidence to the grand jury by withholding the FBI report, which established that Walters had turned his recorder off after entering his patrol car. Jerrel further alleged that Walters had perjured himself before the grand jury in denying that he had turned off his tape recorder prior to his conversation with Jerrel.

Jerrel and her son testified in support of the motion to dismiss Jerrel's indictment. Both claimed, apparently for the first time, that Walters and Jerrel spoke twice outside the courthouse following the January 20 bail hearing. According to this version, after the initial (recorded) conversation, Walters walked Dan Jerrel to the patrol car (presumably turning off his recorder at that time) and then returned to the courthouse, where he spoke with Jerrel again and uttered the alleged threat. At the conclusion of the evidentiary hearing, Superior Court Judge James Hanson denied Jerrel's motion, expressly finding that the testimony of Jerrel and her son was not believable.

On appeal, Jerrel argues that the superior court erred in denying her motion to dismiss the indictment. The viability of Jerrel's theory, however, hinges entirely on the version of events disclosed for the first

---

1. AS 11.56.200(a) reads:
   A person commits the crime of perjury if the person makes a false sworn statement which

the person does not believe to be true.

time by Jerrel and her son in their testimony on the motion to dismiss. The superior court expressly found this version of events incredible. Issues of witness credibility are primarily trial court matters. *Anthony v. State*, 521 P.2d 486, 492 (Alaska 1974); *Long v. State*, 772 P.2d 1099, 1101 (Alaska App.1989). We cannot say that the superior court was clearly erroneous in denying Jerrel's motion to dismiss.

## CHANGE OF VENUE

Jerrel moved to change venue for her trial from Homer to Kenai. She claimed that it would be impossible for her to obtain a fair and impartial jury in Homer, due to publicity concerning the December 1985 incident in which Dan Jerrel defaced a mural, as well as more recent publicity concerning a September 1987 incident in which her husband and her son David had become involved in a gunfight with, and had shot, another man. Superior Court Judge Charles K. Cranston denied Jerrel's motion without prejudice to renewal if efforts to select a jury in Homer indicated possible jury bias. Jerrel renewed her motion upon completion of jury selection in Homer. Judge Cranston denied the renewed motion, finding that the jury selected would be capable of rendering an impartial decision. Judge Cranston nevertheless allowed Jerrel four additional peremptory challenges. Jerrel claims on appeal that the trial court erred in failing to order venue changed.

A defendant who seeks to change venue based on potentially prejudicial pretrial publicity must ordinarily establish actual bias on the part of the jurors finally selected to sit on the case. *Newcomb v. State*, 800 P.2d 935, 937–38 (Alaska App. 1990). This rule is relaxed, however, "when a case generates 'intensive pretrial publicity' that results in 'a substantial number of venirepersons [who] appear to have been prejudiced....'" *Id.* at 938 (quoting *Mallott v. State*, 608 P.2d 737, 748 (Alaska 1980)). In such cases, the trial court must order venue changed if it finds a substantial likelihood that unrevealed jury prejudice will preclude a fair trial by an impartial jury. *Newcomb v. State*, 800 P.2d at 938.

Although relevant, "naked statistics" alone cannot determine the existence of a substantial likelihood of unrevealed jury bias; the issue is one for the sound discretion of the trial court. *Id.* at 938–39. Relevant factors for the court to consider in exercising its discretion include the recency of the publicity, its potential for inflaming jurors, and the nature of the jury panel's familiarity with the trial participants. *Id.* at 939. On appeal, this court must independently evaluate the circumstances surrounding the denial of a motion to change venue, but we may reverse the trial court's decision only for an abuse of discretion. *Id.* at 937.

In the present case, Jerrel has made no showing of actual bias on the part of the jurors who sat in judgment of her. Jerrel can prevail on her change of venue claim only if her case is governed by the more relaxed *Mallott* standard for cases in which intensive pretrial publicity results in disqualification of a "substantial number of venirepersons." *Mallott v. State*, 608 P.2d at 748.

Here, juror questionnaires revealed that approximately two-thirds of Jerrel's panel—thirty-seven of forty-seven prospective jurors—had at least some knowledge of past charges against members of the Jerrel family. Of the thirty-seven, eleven—less than a quarter of the entire panel—were eventually disqualified for cause due to adverse information concerning the Jerrels.

In our view, the disqualification of eleven jurors from a panel of forty-seven due to adverse pretrial publicity falls somewhere near the border of the "substantial number" required to trigger the relaxed change of venue standard. *Cf. Newcomb v. State*, 800 P.2d at 938 (deeming the "substantial member" requirement satisfied where twenty-eight of seventy-eight venirepersons—more than one-third—were disqualified due to pretrial publicity). For purposes of this decision, even if we assume that the number of jurors disqualified in this case falls on the side of the border

favoring Jerrel and is a "substantial number," the fact that it is only marginally substantial suggests only a minimal danger of prejudice resulting from unrevealed jury bias.

Other relevant circumstances do little to fortify the anemic inference of bias that arises from the naked statistics. The pretrial publicity at issue in this case dealt almost exclusively with members of the Jerrel family other than Jerrel herself. It was primarily factual in nature, divulged no inadmissible evidence relating to Jerrel, and contained nothing particularly inflammatory, especially insofar as Jerrel's case was concerned. *Cf. Jerrel v. State*, 756 P.2d 301, 303 (Alaska App.1988). Most of the publicity dealt with Dan Jerrel's offense and was published long before Jerrel's case came to trial.

While Jerrel's case was tried in Homer, a relatively small community, the record does not indicate that Jerrel was a particularly prominent member of the community; neither do the other principal participants in the case appear to fall into such a category. *See, e.g., Oxereok v. State*, 611 P.2d 913, 918 (Alaska 1980); *Nickolai v. State*, 708 P.2d 1292, 1292–93 (Alaska App.1985). Of the jurors actually seated to hear Jerrel's case, four knew nothing of Jerrel or her family, six had inconsequential knowledge of other Jerrel family members' involvement in the vandalism or gunfight incidents or were aware of the Jerrel family generally, and only two knew anything about Jerrel herself.

Although denying Jerrel's motion to change venue, Judge Cranston allowed her four additional peremptory challenges. Notably, Jerrel used only three. Considering the totality of the circumstances, we conclude that Judge Cranston did not abuse his discretion in failing to find a substantial likelihood that Jerrel would not receive a fair trial by an impartial jury. The trial court did not err in denying Jerrel's motion.

### CROSS–EXAMINATION OF TROOPER JOHNSTON

■ At trial, Alaska State Trooper Randy Johnston, who had investigated Jerrel's criminal complaint against Walters, testified for the state that he had determined Jerrel's charge unfounded after reviewing Walters' tape and interviewing Walters and Jerrel. On cross-examination, Jerrel's counsel attempted to ask Johnston:

> And did [Jerrel] tell you that the reason that—one of the reasons that she was concerned was because she had heard of another person that she thought Walters had threatened?

Judge Cranston sustained the state's objection to this question on hearsay grounds. On appeal, Jerrel argues that the court erred in its ruling, thereby depriving her of her constitutionally guaranteed right of confrontation.

■ The ruling of the trial court on an evidentiary matter will not be overturned absent an abuse of discretion. *Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980). While Jerrel claims that she was denied the opportunity to challenge the soundness of Johnston's basis for concluding that her criminal charge against Walters was unfounded, the question precluded by the trial court had no bearing on this issue except to the extent that it called for hearsay. An affirmative answer to the question might have helped Jerrel, but only insofar as the substance of the out-of-court statement attributed to Jerrel in the question—that Walters had been accused of other similar misconduct—was taken to be true.

Jerrel offers no hearsay exception that could conceivably have justified the admission of this evidence. She relies instead on the assertion that her constitutional right to confrontation entitled her to cross-examine Johnston fully. No matter how broadly the fabric of the confrontation clause may be cut, however, it does not clothe the accused with the right to introduce evidence to the jury in a form that is legally inadmissible. *See Larson v. State*, 656 P.2d 571, 575 (Alaska App.1982). We find no abuse of discretion in the trial court's refusal to permit the disputed question.

### PROOF OF INTENT—CIRCUMSTANTIAL EVIDENCE INSTRUCTION

■ Over Jerrel's objection, the trial court gave the jury an instruction telling it that Jerrel's mental state could be proved

by circumstantial evidence. Jerrel claims on appeal that the court erred in giving this instruction. She argues that "[n]owhere was the jury instructed that the state must prove beyond a reasonable doubt that Viola Jerrel did not believe her statements to be true. The state of mind by circumstantial evidence instruction which was given wholly fails to advise the jury of the separate element of the offense."

Jerrel's argument lacks merit. In fact, Jerrel's jury received instructions covering the necessary elements of the offense; these instructions expressly stated that, "[i]n order to establish the crime of perjury ... it is necessary for the state to prove beyond a reasonable doubt ... [that] the defendant did not believe the sworn statement to be true," and that, "[a] person commits the crime of perjury if the person makes a false sworn statement which the person does not believe to be true. In order to establish the crime of perjury ... it is necessary for the state to prove beyond a reasonable doubt ... that the defendant did not believe the sworn statement to be true."

The challenged instruction on use of circumstantial evidence to prove state of mind merely apprised the jury of the forms of evidence that could be relied on to prove that Jerrel acted knowingly. This instruction was taken verbatim from Revised Alaska Pattern Criminal Jury Instruction 1.44 (1988), and Jerrel cites no authority suggesting that it is either inaccurate or inappropriate. Similar instructions have consistently been approved. *See, e.g., Gipson v. State*, 609 P.2d 1038, 1042 (Alaska 1980); *Eliason v. State*, 511 P.2d 1066, 1072 (Alaska 1973); *Hohman v. State*, 669 P.2d 1316, 1323–24 (Alaska App.1983); *Bidwell v. State*, 656 P.2d 592, 595–96 & n. 3 (Alaska App.1983). We find no error.

## JERREL'S ABSENCE DURING PLAYBACK OF THE WALTERS TAPE

Upon submission of her case to the jury, Jerrel indicated her willingness to waive the right to be personally present during any playback of testimony the jury might request,[2] but she did not waive her right to be present if the jury asked to hear Exhibits 5 and 8—Walters' recordings. Judge Cranston stated "that if either Exhibits 5 or 8 are requested, then I will require the presence of counsel and the defendant."

In the course of its deliberations, the jury asked to hear the two exhibits, and the court granted this request. Although the record of proceedings affirmatively reflects that Jerrel's counsel was present during the playback and did not complain of Jerrel's absence, it is otherwise silent on the issue of Jerrel's presence. At no later point in the trial did Jerrel claim, either personally or through counsel, that she was absent during the playback of Exhibits 5 and 8. Nor did Jerrel ever assert such a claim before the superior court in the form of a post-verdict motion for a new trial or an application for post-conviction relief.

Jerrel now attempts to argue, for the first time on appeal, that she was in fact absent during the playback and that her absence warrants a new trial. In our view, the issue cannot properly be presented on appeal in the first instance. At the heart of Jerrel's claim is an unverified factual contention—Jerrel's claim that she was absent during the playback—that was never asserted or litigated below and that is wholly unsubstantiated by the trial record.

Jerrel claims that the silent record suffices to establish her absence—or at least raises a sufficient doubt to warrant a remand for further proceedings on the issue. This claim is unpersuasive. Judge Cranston affirmatively ruled that no playback of Exhibits 5 and 8 would be allowed without Jerrel being personally present; Jerrel's counsel agreed with this ruling. The record contains no indication that the court ever withdrew or modified its decision. Later, when the jury asked to hear the exhib-

---

2. The purported waiver was made on the record by defense counsel in the presence of Jerrel, who voiced no objection. The parties dispute whether the waiver was sufficient under the standard set out in *Lee v. State*, 509 P.2d 1088, 1093 (Alaska 1973). Since no playback of testimony was ever requested, however, we need not resolve the dispute.

its, Judge Cranston granted the request, and Jerrel's counsel voiced no objection.

Under the circumstances, the silence of the record operates to defeat Jerrel's claim of absence, not to establish it. The presumption of regularity attaches to this situation, requiring this court to presume, in the absence of a contrary showing, that the trial court acted in accordance with its ruling: "When the jurisdiction of a competent court has attached, every act is presumed to have been rightly done until the contrary appears." *United States v. Manthei's Bondsmen*, 2 Alaska 459, 466 (D.Alaska 1905). *See also Wright v. State*, 501 P.2d 1360, 1372 (Alaska 1972); *United Bonding Insurance Co. v. Castle*, 444 P.2d 454, 457–58 (Alaska 1968); *Houston–Hult v. State*, 843 P.2d 1262, 1266 (Alaska App.1992). Jerrel must assert her claim in the trial court in the first instance.

## APPOINTMENT OF CONFLICT COUNSEL

■ After the jury returned its verdicts convicting Jerrel, but prior to the sentencing hearing, Jerrel's trial counsel, who was privately retained, withdrew from Jerrel's case. The court appointed the Alaska Public Defender Agency (PDA). Jerrel objected, claiming that she had conflicts with both the PDA and the Office of Public Advocacy (OPA), the agency normally responsible for public representation when a conflict precludes representation by the PDA. Jerrel accordingly asked the court to appoint private counsel to either handle her case or advise her on the issue of conflict.

Jerrel was vague as to the nature of the purported conflicts. She maintained that the OPA had mishandled representation of one of her sons in a criminal matter. She also claimed that the PDA's handling of Dan Jerrel's case involving the mural had been incompetent. Neither the PDA nor the OPA acknowledged any conflict, and the OPA affirmatively opposed reassignment of the case to it from the PDA, arguing that the PDA had no conflict. Judge Cranston ultimately declined to order the appointment of private conflict counsel,

and Jerrel was represented at her sentencing hearing by the PDA.

On appeal, Jerrel argues that Judge Cranston erred in failing to appoint a private attorney to assist her in establishing the existence of a conflict. She cites cases upholding the right to effective assistance of counsel at all stages of a criminal proceeding and claims that the trial court had judicial power to require a private attorney to represent her. She argues, finally, that since she had no working relationship with the PDA and claimed to have a conflict with the OPA, only a private attorney could consult with her on whether a conflict existed.

■ We will reverse a trial court's refusal to appoint independent counsel only for abuse of discretion. *Cf. Ortberg v. State*, 751 P.2d 1368, 1375 (Alaska App.1988). An indigent defendant who cannot retain counsel has no right to an appointed counsel of choice or to the appointment of private counsel. *Coleman v. State*, 621 P.2d 869, 878 (Alaska 1980). Moreover, "[t]he right to effective assistance of counsel does not encompass the right to reject appointed counsel and have new counsel appointed in the absence of any showing of cause for such change. The due process clauses of the state and federal constitutions do not guarantee a 'meaningful relationship' between [a] client and his appointed counsel." *Monroe v. State*, 752 P.2d 1017, 1020 (Alaska App.1988) (citing *Morris v. Slappy*, 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983)).

Apart from establishing Jerrel's obstinate resolve to avoid cooperating with counsel from either the PDA or the OPA, Jerrel's allegations of conflict revealed nothing more than her vague dissatisfaction with the level of representation she believed those agencies had provided her sons in other matters. Because Jerrel failed to articulate or substantiate any colorable ground for a legal conflict between her own interests and other interests actively advocated by either the PDA or the OPA, she was not entitled to the appointment of private counsel, either for purposes of representing her interests general-

ly or for purposes of counseling her on the existence of potential conflicts.

The trial court did not abuse its discretion in denying Jerrel's request for appointment of private counsel.

## APPLICATION FOR POST-CONVICTION RELIEF

Following her conviction, Jerrel filed an application for post-conviction relief, alleging ineffective assistance of counsel by her trial and sentencing attorneys. After affording Jerrel an opportunity to amend her application, Judge Cranston dismissed it, concluding that Jerrel had "fail[ed] to meet threshold showing of ineffective assistance [of counsel]" by not "demonstrating that the acts of counsel fell below minimum level of competence or that the decisions of counsel were not tactical." Jerrel now challenges this ruling.

■ The trial court's denial of post-conviction relief is reviewed for abuse of discretion. *Hensel v. State*, 604 P.2d 222, 235 & n. 55 (Alaska 1979). Jerrel's application set forth conclusory allegations concerning purportedly ineffective actions by her trial and sentencing counsel. However, the application recited no facts to rebut the presumption of competence or to establish that the purportedly incompetent actions of counsel did not reflect sound tactical choices; nor did the application include affidavits of counsel or any averment that Jerrel's counsel were unwilling to provide affidavits.

Under the circumstances, Judge Cranston did not abuse his discretion in concluding that Jerrel had failed to make out a *prima facie* case of ineffective assistance of counsel and in dismissing Jerrel's application on that ground. *State v. Jones*, 759 P.2d 558, 570 (Alaska App.1988).

## SENTENCING

Jerrel was convicted of two counts of perjury. The offense is a class B felony, AS 11.56.200(c), and, as such, is punishable by a maximum term of ten years and by presumptive terms of four and six years for second and subsequent felony offend-

ers. AS 12.55.125(d). As a first felony offender, Jerrel was not subject to a presumptive sentence. Judge Cranston sentenced Jerrel to one and one-half years with all but six months suspended on each count. Because the two counts involved offenses committed on clearly separate occasions and involved distinct acts, Judge Cranston imposed the sentences consecutively, for a total of three years with two years suspended.

■ On appeal, Jerrel contends that the court erred in imposing consecutive sentences. Citing *Griffith v. State*, 675 P.2d 662 (Alaska App.1984), she argues that under the circumstances of her case, AS 12.-55.025(g) did not require the imposition of consecutive sentences. This argument, however, misses the mark, since the permissibility of imposing concurrent sentences is not at issue here. *Griffith* was overruled by *State v. Andrews*, 707 P.2d 900, 908 (Alaska App.1985), aff'd, 723 P.2d 85 (Alaska 1986), which held that AS 12.55.-025(g) does not mandate consecutive sentencing under any circumstances.

The sentencing record reveals that Judge Cranston understood that he had discretion to impose Jerrel's sentences either consecutively or concurrently and that he elected to exercise his sentencing discretion by imposing consecutive terms. The judge's explanation of his sentencing decision establishes good cause for imposing consecutive sentences. The decision was not clearly mistaken.

■ Jerrel further maintains that her composite sentence is excessive. She cites the sentencing benchmarks prescribed in *State v. Jackson*, 776 P.2d 320, 326–27 (Alaska App.1989), claiming that she deserves to be placed in the lowest benchmark range—which calls for a probationary term—because her conduct was significantly mitigated and her prospects for rehabilitation are significantly better than average for a typical first offender.

The one-year unsuspended portion of Jerrel's composite sentence falls on the border between the low end of the *Jackson* benchmark range for a typical first offense class

B felony and the high end of the benchmark range for a moderately mitigated case. *Id.* Jerrel would have deserved a sentence within the lowest *Jackson* category only if her case had been exceptionally mitigated in terms of both the conduct involved in the offenses and Jerrel's prospects for rehabilitation. *Id.* at 327.

Judge Cranston determined that Jerrel's separate acts of perjury were not particularly mitigated, since they exposed Officer Walters to "some potential for harm." Jerrel complains that her conduct should nevertheless be viewed as mitigated because her sole motivation was to help her son. It is entirely unclear, however, how Jerrel's knowingly false charges against Walters would have been of practical assistance to Dan Jerrel in his then-pending case. In context, Jerrel's motivation might as readily be characterized as vindictiveness or spite on behalf of her son as a misguided desire to help him.

Nor do Jerrel's prospects for rehabilitation appear more favorable than those of a typical first offender convicted of similar misconduct. Jerrel persisted in her false claims against Walters throughout the course of the proceedings, showing little insight into the wrongfulness of her conduct. As noted in the presentence report, "there is little reason to believe [Jerrel] has learned anything from experience with the criminal justice system. She continues to deny her guilt and project blame. This would imply her chances for rehabilitation are small."

Jerrel's composite sentence is comparable to or more favorable than sentences that we have approved for other first offenders convicted of perjury. *See Esmailka v. State,* 740 P.2d 466, 471 (Alaska App.1987) (sentence of three years with two and one-half years suspended); *DeMan v. State,* 677 P.2d 903, 910–12 (Alaska App. 1984) (concurrent four-year sentences for seven counts of perjury); *Boyles v. State,* 647 P.2d 1113, 1119–20 (Alaska App.1982) (three-year sentence affirmed for first offender, convicted of one count of perjury, who also suborned perjury by another witness).

Having independently reviewed the entire sentencing record, we conclude that the sentence imposed below is not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

## CONCLUSION

The conviction and sentence are AFFIRMED.

MANNHEIMER, J., not participating.