**Matthew Mark MOORE, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–8584.

Court of Appeals of Alaska.

Nov. 4, 2005.

Averil Lerman, Assistant Public Advocate, and Joshua P. Fink, Public Advocate, Anchorage, for the Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

Matthew Mark Moore was convicted by a jury of attempted first-degree sexual assault, attempted second-degree sexual assault, and first-degree burglary.[1] Moore appeals, contending that the trial court erred in denying his request for another attorney and claiming that the evidence was insufficient to establish the burglary charge. Because we reject these claims, we affirm Moore's convictions. Moore claims his sentence is excessive and illegal. We reject most of Moore's attacks on his sentence but we conclude that Moore's convictions for attempted first-degree sexual assault and attempted second-degree sexual assault must merge. Accordingly, we affirm Moore's conviction, but we must remand for re-sentencing.

### Background facts

July 9, 2002 was Carie Curran's birthday. Curran and her friend, T.F., planned to celebrate Curran's birthday with drinks at T.F.'s apartment. T.F. was twenty-years-old, and Curran was in her late twenties.

---

**1.** AS 11.41.410(a)(1) & AS 11.31.100(a); AS 11.41.420(a)(3)(B) & AS 11.31.100(a); and AS 11.46.300(a)(1), respectively.

Early in the evening, T.F. and Curran were shopping for work supplies at a local store in Nome and happened to meet Moore. T.F. knew Moore because she and her boyfriend, who was out of town, had previously rented a room from Moore's step-father, and because T.F.'s boyfriend and Moore used to work together. July 9th was also Moore's birthday, his eighteenth. When T.F. and Curran learned that it was Moore's birthday, they invited him to T.F.'s apartment to have a drink with them.

Moore stopped by some time later and they all drank until Curran decided she wanted to go to a bar for awhile. T.F. dropped Curran off at the bar, then stopped for gas; she did not have any money with her so she returned to her apartment to get her wallet. As T.F. and Moore were leaving the apartment to pay for the gas, they ran into Raquel Thurman and Daniel Cortez, and invited them over for drinks at T.F.'s apartment. Thurman and Cortez followed T.F. and Moore to the gas station, then drove their car home so they would not have to drive home after drinking. T.F. dropped Moore off at her apartment, then picked up Thurman and Cortez at their home and drove back to her apartment.

Everyone talked and drank for several hours. Moore and T.F. became extremely intoxicated. According to Thurman, T.F. "had no clue what she was doing." T.F. could not sit up straight and she was hitting her head on the walls. Cortez had to carry her to the bathroom two or three times so she could vomit, then carried her to her bed.

Cortez and Thurman left T.F. on the bed with an empty bowl and a glass of water beside her. T.F. was wearing pants, a tank top, a button-up shirt, and a long sweater coat. Cortez announced that he and Thurman were leaving, and that Moore was leaving with them because he (Cortez) was not going to leave anyone with T.F. when she was passed out. Cortez tried to lock the door on the way out, but could not.

The three left in a cab and Thurman and Cortez got out at their residence. Moore told the cab driver to return to T.F.'s apartment, and said that he had not wanted to leave in the first place. The driver took Moore back to T.F.'s apartment.

T.F.'s neighbors, Tory and Gypsy Maul, returned from work between 1:30 and 2:00 a.m. on the morning of July 10th in the same taxi that came to pick up Thurman, Cortez, and Moore. The Mauls were watching television when they heard yelling and loud music coming from T.F.'s apartment. Tory Maul knocked on T.F.'s door to ask that they quiet down. Moore answered the door, said he was alone in the apartment, and promised to turn down the music.

Maul returned to his apartment, but soon after, he saw T.F.'s dog being thrown out the door of her apartment. Through the open door, Maul heard T.F. screaming, "Help me. Somebody help me get him off me." Maul forced his way into T.F.'s apartment in time to see Moore slap T.F., tell her to "[s]hut the fuck up," and shove her to the floor. Moore, wearing only boxers and a t-shirt, attacked Maul. Maul restrained Moore and told his wife, who was now standing at the door, to take T.F. to their apartment and call the police. T.F. was hysterical and was wearing a bra and a torn tank top; she was naked from the waist down. T.F. told Gypsy that Moore "was trying to have sex with her and she didn't want to."

Maul restrained Moore until the police arrived. Moore was very drunk and was threatening Maul and swearing. When Moore seemed to calm down, Maul told him he could get up if he waited for the police. Moore grabbed his bag and said he was leaving, but Maul stopped him.

Officers William Droke and Byron Redburn arrived at T.F.'s apartment. Officer Droke interviewed T.F., who was sobbing on the Mauls' couch and was still very sick. T.F. told Officer Droke that Moore touched her on her chest and stomach and would not leave her alone. Officer Redburn took custody of Moore, who remained combative as the two officers escorted him to the patrol car.

At trial, two young men testified that a few days before his birthday, Moore was camping with friends outside of Nome. He mentioned two or three times that he "was going to get laid" on his birthday. The young men who

heard these comments testified that Moore was intoxicated, and that this kind of discussion was "normal guy talk."

Moore testified that he remembered drinking with T.F., Thurman, and Cortez, but remembered little else of the evening. He remembered going outside to smoke a cigarette and splashing water on his face. Moore testified that after that, he remembered being choked by Maul, and waking up in jail. He did not remember riding in the cab or fighting with the police. According to Moore, T.F. had told him that he could sleep on her couch if he got too drunk to drive home. Moore also testified that he regularly slept in boxers. Moore denied assaulting T.F.

T.F. testified that the last thing she remembered was sitting on the couch and talking with Thurman. The next thing she remembered was waking up in her bed and struggling with Moore, who was trying to have sex with her. T.F. testified that she was fighting and screaming, and that Moore ripped her clothes off. Officer Droke testified that he retrieved a pair of torn pants on July 10th that T.F. identified as the ones she was wore the previous evening. T.F. further testified that she did not remember Moore asking at any point in the evening if he could stay on her couch if he drank too much.

The jury convicted Moore of attempted first-degree sexual assault, attempted second-degree sexual assault, and first-degree burglary. Judge Ben J. Esch sentenced Moore to a term of 12 years with 4 suspended. Moore appeals.

*Moore's claim that his attorney should have been replaced*

At the calendar call the day before trial was scheduled to start, Moore's public defender presented the court with an unsigned document authored by Moore's father, Mark Moore. In this document, Moore's father asked to participate in his son's defense, and also made broad allegations that Michelle Hall, his public defender, "in collusion with local criminals/elements," had lied to the Moores and to the court, and had maliciously refused to properly defend his son. While Judge Esch assured Moore that he could talk with his father about his defense, the judge said that Moore's father could not act as co-counsel because he was not admitted to practice law.

Moore told the court that his attorney had "flat told me no when I've requested things. She flat told me no, I will not do that." Judge Esch told Moore that while a defendant has control over some aspects of trial strategy, there were some things an attorney could not ethically do. Moore stated that he had asked his attorney three times to discuss the particulars of his case with his father, who said he was not willing to put up money for bail without knowing what was going on with the case. Judge Esch reiterated that Moore's father could not act as co-counsel, and asked the parties if they were ready for trial.

The prosecutor said that he was ready, and Moore's attorney said that while she was ready, she was not sure if Moore was ready. Moore said, "I'm not prepared. My constitutional rights have been violated by [my attorney] and by the State.... I need a new public defender." Moore complained that Hall had waived more time than he had agreed to before the indictment and that he was incarcerated the whole time.

Moore's public defender said that she had explained to Moore that he could not have another public defender, because if there was an ethical conflict, it would apply to the whole agency. Judge Esch advised Moore that any delay arising from the substitution of counsel would not be counted for purposes of Criminal Rule 45, the speedy trial rule. Moore indicated that he understood this.

The prosecutor objected to a continuance because two of his witnesses were moving out of state in three weeks. He argued that "people like Mr. Moore, as long as they're listening to bad advice from family members, they're never going to get along with whatever attorney they've got, assuming the attorney's competent." Asserting that no competent attorney would follow Moore's father's advice, the prosecutor urged the court to proceed to trial as scheduled.

Judge Esch, noting that it was "pretty clear there is a significant difference of opin-

ion between counsel and the defendant in this case," inquired further, asking Moore if there were other problems beside the issue of waiving time. Moore alleged that Hall had lied to him on two or three occasions, saying things he "later found out just were not true from other people in the community." He also said that although he had told her several times what he thought his defense should be, he still did not know what her plan was, as he had only seen "a couple of handwritten notes on a legal pad."

Moore's public defender stated that she was not sure if "this is the forum to sort these things out." She said she had prepared the case as she normally prepared cases. She met with Moore's father twice, and visited Moore numerous times. She asked Moore if he wished to pursue his claim that the waiver of time was unconstitutional, but he declined. She discussed the defenses suggested by Moore and his father, and told them what would and would not work. She stated that as far as she knew, she had neither lied to Moore nor provided him with incorrect information. She noted that it was a difficult situation and expressed concern about how far the court might go in examining the attorney-client relationship. Judge Esch replied that he did not plan to ask about the attorney-client conversations. Rather, Judge Esch indicated that "I'm just trying to find out what [particular complaints he has]."

Judge Esch asked Moore if he had discussed the defense with his attorney. Moore acknowledged that his attorney had shown him some "handwritten stuff that I can't read," and told him what she thought the prosecutor might do. He insisted that this was inadequate, however:

> But it's not a defense that I put forth that is my defense. She has told me that I'm wrong and that this and that isn't admissible, when I know it is. And my defense, what I am defending myself against, the accusations that the State has made, she just flat told me I'm wrong and that that's not right.

Moore also said that the reason he had not raised the issue of the time waiver was that his attorney had told him it would not make any difference.

Judge Esch noted that while Moore certainly had "some dissatisfaction" with Hall, general dissatisfaction was insufficient to disqualify an attorney. The judge denied Moore's request for a new attorney, "[a]bsent some more specific information about why there's an incompatibility between the two of you." The court confirmed that trial would begin the next day, as scheduled.

That afternoon, Judge Esch called a status hearing to reconsider whether Moore's father could participate in Moore's defense. The judge had reviewed some cases and concluded that he might have the discretion to allow Moore's father to assist Moore in a limited fashion.[2] However, the court confirmed that Moore's father did not wish to represent his son alone, and the court asked Moore's attorney if she was willing to have Moore's father act as co-counsel with her.

The attorney expressed concern that the defense theories offered by Moore and his father were "almost polar opposites" to her own theories of defense. She worried that if she presented the defense Moore suggested she would be committing malpractice. She also said that Moore did not want her to be his attorney, and told him to ask the court again for new counsel, as "maybe another lawyer could do that." The attorney thought she might need to withdraw, because she was concerned that she could not zealously represent Moore the way he wanted her to.

Judge Esch found that the attorney and Moore's father could not viably serve as co-counsel. He asked Moore if he wanted to represent himself or have his father represent him, but Moore declined. Moore wanted an attorney, he just did not want the one assigned to his case. Judge Esch asked if Moore could provide any more details explaining why he wanted new counsel. Moore responded that "it's really the same as what I told you earlier this morning." Moore

---

**2.** *See Skuse v. State,* 714 P.2d 368, 370–72 (Alaska App.1986) (discussing but not deciding the issue of lay representation).

repeated that his attorney had lied to him, had waived more time than he had agreed to, and had intimidated him out of raising the waiver issue before the court. He stated, "I don't feel safe going into a trial to defend myself with [her] as my lawyer."

Judge Esch denied Moore's request for a new attorney, reasoning that under *Mute v. State*,[3] Moore had not provided sufficient reason for substitution of counsel. Because Moore's father indicated that he did not want to act as Moore's sole counsel, Moore did not want to proceed without a trained attorney, and his attorney could not work with Moore's father, Judge Esch denied Moore's request that his father act as lay counsel. The court concluded, "Mr. Moore, you've made it clear that you want a different lawyer and I'm sure we'll revisit this issue again before the jury is called, but at this point, I can't find that there's adequate grounds to replace [your attorney] in this case."

Later that night, Moore's attorney, Hall, requested a hearing before jury selection began. At the hearing, the attorney told the court she had made "a huge error"—she had incorrectly identified the culpable mental state for the three charges as "knowingly," rather than "intentionally." She hoped to have a few days to explore the defense of intoxication before trial began. But that morning, Moore told her he was not willing to waive his rights under Rule 45, the speedy trial rule. Although the judge estimated that the 120 days would not expire until November 7th, sixteen days later, Moore's attorney said that Moore did not want a continuance.

Hall's revelation was significant because Moore's intoxication supported a potential tactic to defend the charges of attempted sexual assault. The culpable mental state for an attempt to commit a crime is "intentionally."[4] Under AS 11.81.630, a defendant's intoxication may be relevant to negate an intent to cause a result.[5]

Moore told the court that his attorney's new view of the case "has almost everything to do with my position against the State's allegations." But Moore announced that because it was her mistake, he was not willing to agree to a continuance.

The attorney expressed concern that she could not present an intoxication defense without more time to prepare and to locate an expert. The prosecutor objected to a continuance, arguing that the attorney would have sufficient time during jury selection and the State's case to prepare the defense. The prosecutor did not claim any prejudice because of the timing of the notice.

Moore's attorney was not convinced that she would have sufficient time to prepare. Judge Esch stated, "It's difficult but—all right. Then I guess we're ready to go. We'll start at 9:00 o'clock." Jury selection began soon after. During this hearing, no one discussed changing Moore's attorney.

Before opening statements the next morning, Moore's attorney filed a document that read as follows:

I, Matt Moore, understand that intoxication may be a defense in the charges against me in case number 2NO–S02–454 CR. I just learned on the evening of trial that intoxication may be a defense. My attorney has recommended that we request a continuance in the trial to explore this possible defense. Requesting a continuance would require me to waive my right to a speedy trial under Criminal Rule 45 for a period time [sic]. I am not willing to waive my right to a speedy trial under Criminal Rule 45 and am choosing to go forward with trial without exploring intoxication as a defense to any of my charges.

The signature line was blank. Moore had declined to sign. The note was signed by Moore's attorney and another public defender as witness. Judge Esch made no comment about the note or its contents, and called the jury in for opening statements.

■ We review the superior court's denial of a defendant's motion to change his attorney for abuse of discretion.[6] When, as here,

---

3. 954 P.2d 1384 (Alaska App.1998).

4. *See* AS 11.31.100(a).

5. *See Neitzel v. State*, 655 P.2d 325, 330–31 (Alaska App.1982).

6. *See Mute*, 954 P.2d at 1386; *Jerrel v. State*, 851 P.2d 1365, 1372 (Alaska App.1993).

a dispute arises between a defendant and an attorney, we advised judges, in *Mute*, to inquire into the nature of the dispute between attorney and client with caution.[7]

The facts in *Mute* are similar to those in this case. Mute asked for a new attorney a week before his trial, stating that he had lost confidence in his attorney and did not feel comfortable with him.[8] Because the trial judge thought that Mute's complaints did not represent sufficient reason to remove the attorney, the judge denied the motion.[9] Mute renewed his motion, complaining that his attorney believed Mute was guilty, had not filed pre-trial motions Mute had requested, and had not discussed his strategy for Mute's defense.[10] When the court asked for further details, however, Mute was unable to elaborate.[11]

The judge denied Mute's motion, reasoning that Mute's allegations did not rise to the level of ineffective assistance of counsel.[12] We upheld the trial court's decision, noting that indigent defendants "are not constitutionally entitled to counsel of their choice," and are not even guaranteed a "meaningful relationship" with their attorneys.[13] We advised trial judges to exercise care in these situations:

> Moreover, absent extraordinary circumstances, [the trial judge] was rightfully hesitant to enter into an extended examination of [the attorney's] view of the case and his trial strategy, or to otherwise insinuate herself as referee in the attorney-client relationship. [The judge] therefore did not abuse her discretion when she denied Mute's motion to discharge [his attorney].[14]

■ Moore was unhappy with his attorney's preparation of the case and he disagreed with his attorney's evaluation of the merits of his view of the case. However, Moore's public defender was representing Moore under court appointment. Moore did not have the power to dismiss his attorney, nor did Moore have the right to have his attorney discharged at will by the court. As the supreme court ruled in *Coleman v. State*,[15] "[i]ndigent defendants are not constitutionally entitled to counsel of their choice...."[16] We also said in *Monroe v. State*[17] that the right to effective assistance of counsel does not include the right to reject appointed counsel and have new counsel appointed in the absence of any showing of cause for that change. The due process clauses of the state and federal constitutions do not guarantee a "meaningful relationship" between client and his appointed counsel.[18]

■ Moore argues that Judge Esch did not adequately inquire into the dispute between Moore and his attorney. But Judge Esch asked about the reasons for Moore's dissatisfaction with his attorney and probed for details. The judge listened to Moore's complaints, allowing him to speak as long as he chose. When Judge Esch asked on the afternoon of October 21st if Moore could provide any more details, Moore replied, "Well, it's really the same as what I told you earlier this morning." Based on the information that Moore provided, we conclude that Judge Esch properly concluded on October 21st that Moore had not raised grounds for removing his attorney.

Moore argues that Judge Esch should have conducted an ex parte hearing, so that Moore and his attorney could speak more freely about their respective theories of Moore's defense without divulging the particulars in front of the prosecutor. Moore sug-

---

7. *See Mute*, 954 P.2d at 1385–86.

8. *Id.* at 1385.

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. *Id.* (quoting *Coleman v. State*, 621 P.2d 869, 878 (Alaska 1980) and *Monroe v. State*, 752 P.2d 1017, 1020 (Alaska App.1988), respectively).

14. *Id.* at 1385–86.

15. 621 P.2d 869 (Alaska 1980).

16. *Coleman*, 621 P.2d at 878.

17. 752 P.2d 1017 (Alaska App.1988).

18. *Monroe*, 752 P.2d at 1020.

gests that when his attorney said, "I don't know that this is the forum to sort these things out," she was alluding to the presence of the prosecutor.

Moore also cites *Huitt v. State,*[19] in which the trial court judge held an ex parte hearing to determine whether the defendant could have a new attorney.[20] The court stated, "The hearing was [ex parte] so that Huitt could explain his grievances to Judge Schulz without the prosecutor present. Huitt was concerned that he might otherwise prejudice his case by revealing his trial strategy to the prosecutor."[21] In contrast, neither Moore nor his attorney requested an ex parte hearing in this case.

Following *Mute,* Judge Esch inquired into the nature of the conflict between Moore and his attorney. From our examination of the record, we conclude that Judge Esch did not abuse his discretion on October 21st when he denied Moore's request for a different attorney.

■ Moore next argues that Judge Esch should have appointed a new attorney on the morning of October 22nd. That is, when Moore's attorney told the court that she had made a "huge error" by not previously identifying the correct culpable mental state and the potential defense to that mental state. However, neither Moore nor his attorney asked the court to again consider whether to appoint new counsel. The issue of substituting Moore's attorney was not mentioned during this hearing.

Moore contends that "the trial court was aware that Moore's request for new counsel was a continuing request." The State denies that the trial court had any sua sponte duty to return to the subject. Both briefs address this issue in a single, conclusory sentence. Moore's assertion seems to be based on the judge's final words in each of the hearings on October 21st. At the close of the calendar call that morning, Judge Esch denied Moore's initial request, stating, "[a]bsent some more specific information about why there's an incompatibility between the two of

you, I'm not inclined to grant a new attorney at this point." That afternoon, at the end of the status hearing, the judge stated, "Mr. Moore, you've made it clear that you want a different lawyer and I'm sure we'll revisit this issue again before the jury is called, but at this point, I can't find that there's adequate grounds to replace [the attorney] in this case."

Moore argues that his attorney's comments during the pre-trial hearing on October 22nd provided evidence of her incompetence, and the evidence of incompetence should have triggered some action by the court. Moore argues that his attorney's failings, in concert, should have alerted the court to the attorney's incompetence and prompted the judge to appoint new counsel. But Moore's briefing points out that the case was "relatively simple" with no scientific or technical evidence and almost no case file to become familiar with.

Moore further argues that even if his attorney had been aware of the viability of a diminished capacity defense by the start of trial, her previous errors compromised her relationship with her client "in a manner that constituted a constructive denial of the right to counsel." Moore contends that the document his attorney submitted to the court on October 23rd illustrated the breakdown in the relationship, as Moore refused to concede that he would not agree to a continuance.

But Moore did not request new counsel on October 22nd. Moore himself points out that the case was relatively simple. Moore contends that Hall was incompetent because she did not recognize the potential of a diminished capacity defense. But before trial began, Hall realized that intoxication might be a defense and agreed to "rework" her theories. The record does show that she attacked the State's case on the basis of Moore's intoxication and that Judge Esch instructed the jury on the relationship of voluntary intoxication to the culpable mental state "intentionally." And Hall argued that Moore's intoxication negated his capacity to intend any of the crimes.

---

**19.** 678 P.2d 415 (Alaska App.1984).

**20.** *Huitt,* 678 P.2d at 420.

**21.** *Id.*

While Moore may still have wanted a new attorney, he did not request any action from Judge Esch on October 22nd. Judge Esch did not commit error when he failed to revisit this issue sua sponte.

*Sufficient evidence supports the burglary conviction*

■ Moore argues that there was insufficient evidence to support the burglary conviction. In particular, he contends that there was insufficient evidence supporting the elements of unlawful entry and intent to commit a crime. Because Moore mistakenly views the evidence in the light most favorable to himself, this argument is without merit.

To convict Moore of first-degree burglary, the jury had to find that Moore unlawfully entered or remained in T.F.'s apartment.[22] Unlawful entry means to "enter or remain in or upon premises ... when the premises ..., at the time of the entry or remaining, [are] not open to the public and when the defendant is not otherwise privileged to do so." [23]

At trial, Moore testified that T.F. had told him that he could sleep on her couch if he got too drunk to drive home. Moore argues that this testimony proves he had a reasonable belief that he was privileged to return to T.F.'s apartment, and that his entry was therefore lawful.

Moore relies on *Robey v. Commonwealth,*[24] in which the Supreme Court of Kentucky ruled that the defendant was entitled to a directed verdict on a burglary charge when he entered an apartment with permission but then raped the woman who lived there.[25] In *Robey,* however, there was no dispute that the victim had invited Robey to sleep on her couch.[26] In contrast, T.F. denied giving Moore permission to sleep on her couch. While she could not recall Moore asking to stay, she testified that she would never have given him permission, because she "wouldn't just have some guy stay there in my place." She testified that they were not "that good of

friends" and she did not know him that well. Viewing the evidence in the light most favorable to upholding the verdict, the evidence of unlawful entry was sufficient.

Moore separately argues that the jury instructions should have included a definition of the phrase "privileged to do so." But Moore did not object to the lack of this definition and we do not find plain error.

■ Moore also argues that there was insufficient evidence that he entered T.F.'s apartment with the intent to sexually assault her. The jury heard testimony that Moore returned to T.F.'s apartment and assaulted her soon after; Tory Maul estimated that roughly ten minutes passed from the time Moore left the apartment with Thurman and Cortez until T.F. started to scream. Two witnesses also testified that a few days before the assault, Moore repeatedly stated that he "was going to get laid" on his birthday. Viewing this evidence in the light most favorable to upholding the verdict, the jury could conclude that Moore entered T.F.'s apartment with the intent to commit a crime.[27] From our examination of the record, we conclude that sufficient evidence supports the burglary conviction.

*Moore's attacks on his sentence*

Judge Esch sentenced Moore to 10 years with 4 suspended for Count I, attempted first-degree sexual assault. For Count II, attempted second-degree sexual assault, the court sentenced Moore to 1 year, with 6 months concurrent to Count I. The sentence for Count III, burglary, was 2 years, with 6 months concurrent to Count I. The composite sentence was 12 years with 4 years suspended, 8 years to serve. On appeal, Moore argues that the sentence for Count I was excessive, that the two sexual assault charges should have merged at sentencing, and that the court erroneously failed to find a statutory mitigating factor. Moore also claims that

22. *See* AS 11.46.300(a) & AS 11.46.310(a).

23. AS 11.46.350(a)(1).

24. 943 S.W.2d 616 (Ky.1997).

25. *Robey,* 943 S.W.2d at 620.

26. *Id.* at 617.

27. *See Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981).

the court increased his sentence based on finding a statutory aggravating factor in violation of *Blakely v. Washington.*[28] Finally, Moore contends that the composite sentence he received was excessive.

Judge Esch found that two statutory aggravating factors from AS 12.55.155 applied at sentencing: (c)(5) (Moore knew that T.F. was a vulnerable victim) and (c)(8) (Moore had a criminal history of aggravated or repeated instances of assaultive behavior).[29] The judge stated that he would place no weight on the vulnerable victim factor. Moore conceded that the prior assaultive conduct aggravator applied because Moore had a history of assaultive conduct as a juvenile. The presumptive term for attempted sexual assault in the first degree was 5 years.[30] The court applied the assaultive behavior aggravator to Count I and imposed a sentence of 10 years, with 4 years suspended, 6 years to serve.

■ Moore argues that the court's reliance on this aggravator violated his sixth amendment right to trial by jury as interpreted by *Blakely*. *Blakely* relies on a principle that the Supreme Court recently repeated in *United States v. Booker*:[31] "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." [32] When a judge's sentencing authority is restricted absent proof of aggravating factors, the defendant has a right to demand a jury trial on those aggravating factors (unless the

aggravator is established by a prior conviction or convictions), and they must be proved beyond a reasonable doubt.[33] If the defendant is denied this right, then the sentencing judge cannot exceed the prescribed statutory ceiling.[34]

We recognize that Alaska's pre–2005 presumptive sentencing laws are directly affected by the *Blakely* decision because under those laws, sentencing judges ruled on aggravators themselves and applied a clear and convincing evidence standard of proof.[35] Under *Blakely*, several aspects of the pre–2005 presumptive sentencing laws are unconstitutional.[36]

Moore faced a 5–year presumptive term for attempted first-degree sexual assault. Based on aggravator (c)(8), a criminal history of conduct involving repeated instances of assaultive behavior, Moore received a sentence of 10 years with 4 suspended. The superior court added 1 year to serve and 4 years suspended to the presumptive term.

Moore conceded the history of repeated instances of assaultive behavior aggravator at trial. Nevertheless, this new constitutional rule applies retroactively to cases pending on direct review.[37] Because Moore did not object to the sentencing procedure at trial, he must now show plain error.[38]

We held in *Milligrock v. State*[39] that, consistent with *Blakely*, a sentencing court can rely on prior convictions to establish aggravator (c)(8).[40] And in *Greist v. State*,[41] we ruled that because a juvenile has the right to demand that the State prove a delinquency petition beyond a reasonable doubt to a jury,

---

**28.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**29.** AS 12.55.155(c)(5) and (c)(8), respectively.

**30.** Former AS 12.55.125(c)(1) (prior to 2003 amendment).

**31.** 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

**32.** *Booker,* 543 U.S. at 220, 125 S.Ct. at 756.

**33.** *Blakely,* 542 U.S. at 302–305, 311–12, 124 S.Ct. at 2537–38, 2542.

**34.** *Id.* at 2538.

**35.** *Haag v. State,* 117 P.3d 775, 782 (Alaska App. 2005).

**36.** *Id.* at 782.

**37.** *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

**38.** *Haag,* 117 P.3d at 783.

**39.** 118 P.3d 11 (Alaska App.2005).

**40.** *Milligrock,* 118 P.3d at 15.

**41.** 121 P.3d 811 (2005).

an adjudication of delinquency qualifies as a prior conviction for *Blakely* purposes.[42] But it is not clear from the record whether Moore has more than one juvenile adjudication for assaultive conduct. If Moore does have two or more juvenile adjudications for assaultive conduct, that would prove the (c)(8) aggravator in a manner consistent with *Blakely*. Because Moore must be resentenced, as we discuss below, the superior court can revisit the question of aggravator (c)(8).

■■■ Moore argues separately that the sentence for Count I, attempted first-degree sexual assault, was excessive. The presumptive sentence for a first-felony offender was 5 years;[43] relying on aggravator (c)(8), Judge Esch sentenced Moore to 10 years with 4 years suspended.

Moore argues that this increase from the presumptive term was erroneous because Moore had no prior felonies, his prior criminal history was not so extreme as to indicate sociopathic tendencies, and he was young and intoxicated when he committed the offense. Moore further argues that the offense itself was not heinous, there was no penetration, and the evidence of intent was very weak.

Assuming that Judge Esch properly relied on the prior criminal history aggravator, Moore's argument fails. Judge Esch was free to adjust the presumptive term upon finding an aggravator, and the sentence of 6 years to serve added only 1 year to the presumptive term.

Judge Esch found that while Moore was young, he was already a serious offender. The court was especially concerned that Moore had violated his juvenile probation on several occasions. The judge was also concerned that Moore refused to accept responsibility for his crimes. Finally, Judge Esch found that Moore's actions had a significant psychological impact on T.F.

Given Judge Esch's findings regarding Moore's previous behavior, Moore's refusal to accept responsibility for these offenses, and the traumatic effect the crimes had on the victim, an increase in 1 year to serve was not clearly mistaken.

Judge Esch found that Moore had not proved by clear and convincing evidence that the conduct underlying Count I, attempted sexual assault in the first degree, was among the least serious conduct included in the definition of the offense.[44] Moore argues that this ruling was clearly erroneous because "[t]here was no claim of any actual penetration, nor even any claim of an attempt to achieve penetration." Moore is certainly correct that there was no charge of actual penetration, because he was not convicted of sexual assault, but of attempted sexual assault. He was, however, convicted of "an attempt to achieve penetration," namely, attempted sexual assault in the first degree.

Moore further argues that his conduct was not serious because both he and T.F. were intoxicated and could not remember exactly what happened. Still, Moore ripped off T.F.'s clothing, tearing her tank top and pants, and continued to attack her while she struggled and tried to fight him off. Tory Maul testified that Moore slapped T.F. and shoved her to the floor after Maul entered the apartment to intervene, and Moore threatened Maul and his family. We conclude that Judge Esch's rejection of the least-serious-offense mitigator was not erroneous.

■■■ At sentencing, Judge Esch rejected the defense request to merge the convictions for Counts I and II, attempted sexual assault in the first and second degree, respectively. We conclude that this was error.

■■■ In *Whitton v. State*,[45] our supreme court held that even though a jury has found a defendant guilty of violating two separate criminal statutes, the sentencing court should impose only one conviction and one sentence if the two statutory offenses are so closely related that there are no significant differences between the conduct proscribed and the societal values protected by

---

**42.** *Greist*, 121 P.3d at 812–13.

**43.** Former AS 12.55.125(c)(1) (prior to 2003 amendment).

**44.** *See* AS 12.55.155(d)(9).

**45.** 479 P.2d 302 (Alaska 1970).

each statute.[46] If a trial court decides to impose multiple sentences, the record must reflect why this decision does not violate double jeopardy.[47] Judge Esch ruled that the two attempted sexual assault convictions "are separate and apart from each other."

But that was not the State's theory of the case. In opening statement, the prosecutor described the evidence that would prove that Moore committed both first- and second-degree attempted sexual assault.

> *Prosecutor:* He's charged with a crime called attempted sexual assault in the second degree, attempting to have sex with a passed out person. He started to do *something* to [T.F.], which she woke up in the middle of it. And at that point, it became a more serious offense, attempted sexual assault in the first degree.

In final argument, the prosecutor contended that the evidence established that scenario.

Moore argues that the two attempted sexual assaults should have merged at sentencing because he was convicted of two offenses that arose out of an uninterrupted course of conduct, with no intervening activity, and because the societal interests underlying the two statutes are closely related. Moore contends that both statutes seek to protect the same societal interest.

We previously held that convictions for first-degree sexual assault and first-degree sexual abuse of a minor must merge because the statutes both aim to protect victims from socially unacceptable sexual contact.[48] The fact that one crime requires an affirmative lack of consent while the other substitutes age for lack of consent does not affect the underlying purpose of the statutes.[49] In that case, however, the two convictions resulted from a single act of penetration; multiple convictions were upheld for separate acts of penetration.[50] Moore argues that lack of consent due to incapacitation and lack of consent that is verbally communicated are so closely related that separate sentences cannot stand in his case.

When Judge Esch rejected Moore's merger request, Judge Esch stated only that the two crimes were "separate and apart from each other." But it is clear from our review of the record that the State contended that Moore engaged in a continuous course of conduct that supported both convictions.

In *Whitton,* the supreme court described the analysis as follows:

> The trial judge first would compare the different statutes in question, as they apply to the facts of the case, to determine whether there were involved differences in intent or conduct. He would then judge any such differences he found in light of the basic interests of society to be vindicated or protected, and decide whether those differences were substantial or significant enough to warrant multiple punishments. The social interests to be considered would include the nature of personal, property or other rights sought to be protected, and the broad objectives of criminal law such as punishment of the criminal for his crime, rehabilitation of the criminal, and the prevention of future crimes.
>
> If such differences in intent or conduct are significant or substantial in relation to the social interests involved, multiple sentences may be imposed, and the constitutional prohibition against double jeopardy will not be violated.[51]

The societal interest protected by the two statutes is fundamentally the same, protecting an individual from sexual penetration achieved without the individual's consent, whether there was a lack of consent from a conscious victim or whether there was no consent because the victim was incapacitated.

Because there was no significant or substantial difference in Moore's intent or conduct in the two crimes in relation to the societal interests protected by both, we conclude that separate sentences may not be

---

46. *Whitton,* 479 P.2d at 312–13.

47. *Id.*

48. *Yearty v. State,* 805 P.2d 987, 994 (Alaska App.1991).

49. *Id.*

50. *Id.* at 994–95.

51. *Whitton,* 479 P.2d at 312.

imposed for the two attempted sexual assault convictions. Accordingly, we must remand the case for re-sentencing and Judge Esch must merge the two counts for purposes of conviction and sentencing. We recognize that when a judge imposes a composite sentence for multiple convictions, the judge might not have individually crafted each of the defendant's sentences. A judge is often more concerned with the composite sentence imposed rather than the precise term imposed for each separate count.[52] In addition, when a defendant is sentenced for multiple convictions, this court reviews the composite sentence as a whole; the sentence for any particular count is not viewed individually.[53]

 Next we address the issue of whether Moore's composite sentence is excessive. Moore received a composite sentence of 12 years, with 8 years to serve and 4 years suspended. The presumptive term for the most serious crime for which he was convicted, attempted sexual assault in the first degree, was 5 years.[54] Moore argues that this sentence is excessive because the presumptive term for the most serious offense is a benchmark that should not be exceeded without good reason.[55]

In this case, Judge Esch found good reason to exceed the 5–year presumptive term for the most serious offense. The court found evidence of "a serious substance abuse problem," for which Moore had never completed a long-term treatment program. Judge Esch was concerned that Moore had previously violated his probation, and that he refused to accept responsibility for his current crimes. The court imposed a partially suspended sentence to encourage Moore to focus on rehabilitation and to act as a deterrent in the future.

Moore's composite sentence included only 3 years to serve beyond the presumptive term for Count I. We conclude that Moore's composite term to serve was not clearly mistaken.[56]

*Conclusion*

We affirm Moore's convictions with the proviso that Moore's convictions for attempted first-degree sexual assault and attempted second-degree sexual assault must be merged. Accordingly, we vacate Moore's sentence for second-degree sexual assault. The superior court must re-sentence Moore. We do not retain jurisdiction.

MANNHEIMER, Judge, concurring.

I write separately to clarify the reasons why I join my colleagues in affirming Judge Esch's handling of the dispute between Moore and his attorney, Assistant Public Defender Michelle Hall.

The record amply demonstrates that the relationship between the two was marked by frustration and (on Moore's part) distrust. The record also demonstrates that Moore and Hall had very different ideas about how Moore's case should be defended. But, as Judge Esch correctly perceived, it was not his job to referee this dispute between lawyer and client. Moreover, as Judge Esch also correctly perceived, Moore's frustration with Hall, his distrust of Hall, and his disagreement with Hall concerning litigation strategy, singly or in combination, did not constitute a basis for removing Hall from the case.

An indigent defendant who has court-appointed counsel has a very limited right to demand a change of attorney. As we stated in *Mute v. State*, 954 P.2d 1384, 1385 (Alaska App.1998), the test is whether "relations between attorney and client [have] deteriorated to the point where [the attorney is] incapable of effective communication [with the client] or objective decision-making [about the case]".

**52.** See *Allain v. State*, 810 P.2d 1019, 1022 (Alaska App.1991).

**53.** See *Brown v. State*, 12 P.3d 201, 210 (Alaska App.2000).

**54.** Former AS 12.55.125(c)(1) (prior to 2003 amendment).

**55.** See *Farmer v. State*, 746 P.2d 1300, 1301 (Alaska App.1987).

**56.** See *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974) (holding that an appellate court is to affirm a sentencing court's decision unless the sentence is clearly mistaken).

Despite the antagonism and distrust that Moore felt toward Hall, the record does not show that communication between attorney and client had completely broken down, or that Hall had lost her ability to objectively evaluate and pursue Moore's interests. Thus, Judge Esch correctly refused Moore's demands for a new lawyer.

Moore's case is complicated by the fact that, just before Moore's trial was to begin, and in the middle of the dispute about whether Hall should continue to serve as Moore's attorney, Hall discovered—and announced to Judge Esch—that she had been laboring under a major misunderstanding of the law applicable to Moore's case.

Moore was charged with attempted first-degree sexual assault, attempted second-degree sexual assault, and first-degree burglary. All three of these charges require proof of a defendant's specific intent to commit an ulterior crime.[1] As to the burglary charge, the State was obliged to prove that Moore entered T.F.'s apartment with the intent of sexually assaulting her. As to the sexual assault charges, the State had to prove that Moore assaulted T.F. with the intent of achieving sexual penetration.

Because all three charges required proof of the culpable mental state "intentionally" as defined in AS 11.81.900(a)(1), intoxication was a potential defense to these charges.[2] And, as explained in the lead opinion, the evidence suggested that Moore had been very intoxicated when he returned to T.F.'s apartment and assaulted her.

But Hall had been preparing for trial under the mistaken assumption that the relevant culpable mental state for the three charges against Moore was "knowingly" as defined in AS 11.81.900(a)(2)—a culpable mental state that is not negated by intoxication.[3] Thus, Hall had not been pursuing an intoxication defense.

When Hall discovered her error, she confessed the problem both to Moore and to the superior court. But when Hall explained that she wanted to delay the trial so that she could have more time to plan and assemble an intoxication defense, Moore adamantly refused to agree to any delay. He insisted that his trial begin as scheduled.

Hall did in fact pursue an intoxication defense at Moore's trial. She did not present any expert testimony in support of this defense, but (from the present record) it is not clear what expert testimony would have been available if there had been more time to prepare, or whether this expert testimony would have added much to the evidence of Moore's drinking and behavior that was already before the jury. In any event, if Moore wishes to pursue those issues, he must file a petition for post-conviction relief.

The issue currently before this Court is whether Hall's incipient malpractice adds anything to Moore's argument that Judge Esch should have dismissed Hall from the case and given Moore a new attorney. It does not.

Hall forthrightly admitted her mistake and advised Moore of the things that might be done to recover from this mistake. One of these things was to ask the superior court to delay the trial. After receiving this advice, Moore refused to take it.

It may be true that Moore's decision was attributable, at least in part, to his ill feelings toward Hall. But this does not change the fact that Moore made a knowing decision to insist that his trial begin as scheduled, even though Hall had told him that the lack of additional time might prevent her from investigating or presenting the intoxication defense to the fullest extent.

This episode does not show that communication between Hall and Moore had effectively ceased, or that Hall had lost the ability to objectively evaluate Moore's case and advise him concerning trial strategy.

1. *See* AS 11.31.100(a) (attempt); AS 11.46.300(a) (first-degree burglary).

2. *See Hutchison v. State,* 27 P.3d 774, 775 (Alaska App.2001).

3. AS 11.81.900(a)(2) states, in pertinent part: "[A] person who is unaware of conduct or a circumstance of which the person would have been aware had that person not been intoxicated acts 'knowingly' with respect to that conduct or circumstance[.]"

For these reasons, I join my colleagues in rejecting Moore's claim that Judge Esch should have dismissed Hall and appointed another attorney.

1. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).