Bruce BROWN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7533.

Court of Appeals of Alaska.

Nov. 9, 2000.

Arthur S. Robinson, Robinson, Beiswenger & Ehrhardt, Soldotna, for Appellant.

Dwayne W. McConnell, District Attorney, Kenai, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Bruce J. Brown and two co-defendants, Billy Smith and Dennis Johnson, were indicted on two counts of first-degree murder for killing a man and woman in Kenai. Brown was also charged with eight counts of tampering with physical evidence. Ultimately, Brown reached a plea agreement with the State: he pleaded no contest to two evidence-tampering charges, and the State dismissed the murder charges and the remaining evidence-tampering charges.

Superior Court Judge Jonathan H. Link sentenced Brown to a composite sentence of 10 years' imprisonment with 5 years suspended—5 years to serve. Brown appeals this sentence on several bases.

Brown's two main contentions focus on the fact that Judge Link found that Brown's offense was among the most serious within the definition of the crime—aggravator

(c)(10) [1]—because Brown was actually guilty of two murders, not just evidence-tampering. Brown argues that Judge Link should have barred the State from trying to prove aggravator (c)(10) because the State missed the normal deadline for filing notice of aggravating factors. Alternatively, Brown argues that Judge Link violated the rule of *Hamilton v. State* [2] by allowing the State to rely on hearsay evidence to establish that Brown was guilty of murder, even though Brown took the stand and testified that he was innocent.

Additionally, Brown argues that his composite sentence of 5 years to serve is excessive.

For the reasons explained here, we reject Brown's arguments and affirm his sentence.

### The late-filed aggravator

■ As explained above, Brown pleaded no contest to two counts of tampering with evidence, a class C felony.[3] Brown had no prior felony convictions. Therefore, presumptive sentencing did not apply, and Brown faced a sentence of between 0 and 5 years on each count, subject to the *Austin* rule.[4]

Brown's sentencing hearing was calendared for August 31, 1999. The day before the sentencing hearing, the State filed notice of one proposed aggravating factor. Specifically, the State announced that it intended to argue that Brown's conduct was among the most serious within the definition of the offense, aggravator (c)(10).[5] Proof of this aggravating factor was crucial to the State's sentencing strategy because, without it, the *Austin* rule would limit Brown's sentence on each count to 2 years to serve.[6]

Both AS 12.55.155(f) and Criminal Rule 32.1(c)(1)(A) require notices of aggravating and mitigating factors to be filed well before the sentencing hearing. Thus, the State's notice was late. (Apparently, the prosecutor believed that the notice had already been filed, but discovered at the eleventh hour that it had not been.)

Brown's attorney objected to the tardiness of the State's notice and asked Judge Link to bar the State from pursuing the proposed aggravator. Judge Link agreed that the State's notice was late, but he refused to strike the State's pleading. Instead, Judge Link ruled that Brown's remedy was a continuance of the sentencing hearing (so that Brown could prepare a defense to the proposed aggravator).

On appeal, Brown acknowledges that this court declared in *Kelly v. State* that the normal remedy for a late-filed notice of aggravating or mitigating factors is a continuance of the sentencing hearing.[7] However, Brown argues that a continuance should be the preferred remedy only when the offending party has some good reason for missing the filing deadline. Brown contends that, in his case, the prosecutor missed the deadline through negligence, and thus Judge Link abused his discretion when he continued the sentencing hearing and allowed the State to proceed with the proposed aggravator.

Brown's position is at odds with the rationale of *Kelly*. While the prosecutor in *Kelly* may have had a good excuse for missing the filing deadline for pleading Kelly's prior felony convictions, this court did not rely on the diligence or good faith of the prosecutor in deciding that a continuance was the appropriate remedy. Rather, this court relied on the fact that "[t]he legislature did not intend the presumptive sentencing provisions of the revised criminal code to be applied optionally, at the discretion of the court or the prosecution".

The presumptive sentencing structure is mandatory, and it must be followed when it applies.... Failure to consider prior

---

**1.** AS 12.55.155(c)(10).

**2.** 771 P.2d 1358 (Alaska App.1989).

**3.** AS 11.56.610(b).

**4.** AS 12.55.125(e), (k); *Austin v. State*, 627 P.2d 657, 657–58 (Alaska App.1981).

**5.** AS 12.55.155(c)(10).

**6.** *See Austin*, 627 P.2d at 657–58; AS 12.55.125(k).

**7.** 663 P.2d 967, 974 (Alaska App.1983).

crimes for presumptive sentencing purposes can be condoned only in those cases where the state, after exercising due diligence, is unable to meet the statutory requirements for proof of a prior conviction.

*Kelly,* 663 P.2d at 974.

*Kelly* dealt with the existence of a defendant's prior felony convictions, not with the existence of aggravating or mitigating factors. But in *Hartley v. State*[8], this court applied the same rationale when we held that neither the State nor the sentencing court has the discretion to ignore aggravating and mitigating factors:

> [T]he legislature has established specific guidelines governing sentencing. These guidelines are particularly important in determining presumptive sentences for those previously convicted of felonies. The [legislature's] decision to circumscribe sentencing discretion was in large part based upon a legislative belief that greater uniformity in sentencing should be sought and unjustified disparity eliminated. AS 12.55.005.

> To allow the parties to ignore past convictions or aggravating and mitigating factors suggested by the evidence at trial or disclosed in the presentence report ... would be to encourage unjustified disparity in sentencing. We therefore hold that the state has no discretion to suppress evidence of past convictions or aggravating or mitigating factors.... We [also] therefore conclude that the trial court has the power *sua sponte* to alert the parties to possible aggravating and mitigating factors present in the record[,] so long as the parties are given an opportunity to marshal the relevant evidence, pro and con, and make their arguments accordingly.

*Hartley,* 653 P.2d at 1056.

For these reasons, we conclude that Judge Link did not abuse his discretion when he continued the sentencing hearing and allowed the State to litigate the proposed aggravating factor.

8. 653 P.2d 1052 (Alaska App. 1982).

*Brown's contention that Judge Link impermissibly relied on hearsay statements contained in the pre-sentence report as the evidentiary basis for aggravator (c)(10) after Brown took the stand at the sentencing hearing and contested these hearsay assertions*

The State asserted that Brown's acts of evidence tampering were among the most serious because Brown was actually guilty of the two murders. To prove this assertion, the State relied on information contained in the pre-sentence report and on additional evidence presented at the sentencing hearing.

*(a) The description of the offense contained in the pre-sentence report*

The two murder victims were Harold Enzler and his girlfriend, Nancy Bellamy. Enzler had formerly been married to Michelle Holliman, but the couple had divorced. There was one child from this marriage, a son named Francis. Michelle Holliman currently had custody of the boy, but the superior court custody investigator had recently recommended that Enzler be awarded joint custody.

Holliman was involved in a romantic relationship with Billy Smith, one of the co-defendants in this case. Smith did not get along with Enzler. Once, when Enzler came to visit his son, Smith threatened to kill Enzler. Enzler prepared a petition for a restraining order against his ex-wife and Smith. There was also some indication that Enzler was going to present evidence of Smith's illegal drug use in order to advance his custody request.

In mid-April 1994, Enzler's mother notified the police that she had not seen her son in two weeks. It turned out that no one had seen or heard from Enzler or Nancy Bellamy since the end of March. During the next year, the police received various tips that Billy Smith and another man named Dennis Johnson had murdered Enzler and Bellamy, but the police had no hard evidence to support these accusations.

Then, in August 1997, Billy Smith was arrested after the police found a pound of

cocaine in his possession. The police questioned Smith about Enzler's and Bellamy's disappearance. Smith professed great love for Michelle Holliman, but he initially denied any knowledge of what had happened to Enzler and Bellamy. Under continued questioning, however, Smith told the police that Enzler's and Bellamy's bodies would never be found because they had been thrown into the waters of Cook Inlet.

During two subsequent interviews, Smith confessed that he killed Enzler and Bellamy. Smith explained that he had done this because Enzler and Bellamy were threatening to take Enzler's son, Francis, and move out of state. Smith told the police that he had contacted Bruce Brown, a friend of Enzler's, and convinced Brown to help him murder Enzler and Bellamy. Brown agreed to lure Enzler and Bellamy to a remote location on Escape Road, where Smith would intercept them and commit the murder. Brown later telephoned Smith and told him that everything was arranged. But Smith distrusted Brown; he feared that Brown might actually be planning to help Enzler and Bellamy kill him. So Smith enlisted a third conspirator, Dennis Johnson, to "back him up on this".

Smith and Johnson drove out to Escape Road, then parked the car and raised the hood to make it appear as though the car had broken down. A few minutes later, Brown arrived with Enzler and Bellamy; Brown was driving Enzler's truck. When Brown stopped the vehicle, Smith approached with a pistol in his hand. Brown tried to grab the gun—not to prevent the murder, but because he wanted to perform the murder himself. Smith refused to relinquish the weapon, and he proceeded to kill Enzler and Bellamy.

Following the murders, Smith and Brown moved the bodies to a spot on an abandoned road. They hid Enzler's truck in the garage of the residence where Brown was living. A few days later, Smith and Johnson drove out to where they had hidden the victims' bodies. Smith chopped up the bodies with an axe, and he and Johnson then placed the pieces in plastic bags. Smith and Johnson took a boat onto Cook Inlet, where they dumped the body parts into the ocean. Brown assisted in the cover-up by dismantling Enzler's truck and disposing of the parts.

Shortly after the police obtained this narrative from Billy Smith, they interviewed Bruce Brown. Brown initially denied any involvement in the homicides; he told the police that Smith was lying. However, toward the end of the interview, Brown told the investigators that much of what Smith had said was true. Brown then said that he thought he would be able to locate some of the vehicle parts from Enzler's truck.

On May 1, 1998, a grand jury indicted Smith, Brown, and Johnson. Approximately two weeks later, the police spoke with Danny Moore. Moore had been incarcerated with Brown the previous month. While they were in jail together, Brown told Moore that he needed Moore to help him after Moore was released.

Brown said that he wanted Moore to get rid of some truck parts that were connected to the Enzler homicide. Brown gave Moore detailed instructions on where to find the hidden parts, and Moore passed this information on to the police. Based on Moore's information, the state troopers searched a section of the Kenai Spur Highway, where they discovered various vehicle parts that had been painted with brown primer.

In Brown's interview with the pre-sentence investigator, he declared that his prior statement to the police was true: he knew about the homicides, and he helped to destroy Enzler's vehicle, but he did not participate in the murder. According to Brown, he drove Enzler and Bellamy out to Escape Road because Smith was going to meet him there and buy some cocaine; Enzler came along because he was going to "front" Smith the money for the purchase. But when they arrived, Smith came out and shot Enzler and Bellamy. Brown explained to the pre-sentence investigator that, after the shooting, he smoked a cigarette and then he got back into Enzler's blood-covered truck and drove it back to town. Later, he painted the truck.

*(b) Brown's testimonial denial of his involvement in the murders, and the other evidence presented at the sentencing hearing*

At the sentencing hearing, Brown took the stand and, under oath, repeated the gist of

his statement to the pre-sentence investigator. He said that he drove Enzler and Bellamy out to Escape Road because he thought that Enzler was going to purchase some cocaine. He declared that he did not participate in the planning or the perpetration of the murder, and he did not know that Enzler and Bellamy would come to harm.

Brown testified that, after the shooting, Smith pointed the gun at him and ordered him to help get rid of the evidence. Brown resisted Smith's threats until Smith began threatening to kill Brown's nieces and nephews. At this point, Brown agreed to help Smith dispose of the truck, although he still refused to handle the bodies.

On cross-examination, Brown conceded that he, Billy Smith, and Dennis Johnson were all incarcerated in the Wildwood Correctional Center. While they were there, Brown received the following note from Smith:

> There's no evidence [of] a crime because the crime did not take place. They [i.e., Enzler and Bellamy] are in Mexico, alive and at large. Nothing else. There was no crime. No death [occurred]. There is no evidence of a crime. No proof. We were never there because it did not exist, did not happen. No DNA, no eyewitnesses, no body, no ballistics, no fingerprints, no photos of a crime, no autopsy, no trauma report. We cut up a truck ..., that's all. We do not know whose truck it was, or where it came from, and [we] did not ask. Cutting up a truck is not a crime.
>
> Stop talking about it to your roommate. Don't talk on the phone. They are listening. Stop talking to inmates. They are talking to the prosecutors to make a deal for themselves. We can beat this. It might take eight or nine more months[, but that's] better than many years. Stop telling your cellmate.
>
> You were not there, because it never happened. Do not testify or take the stand. If you do admit it, your knowledge is conspiracy. Your statement will put yourself away [for] 99 [years]. Make no deals. There is no proof of a crime occurr[ing] beyond a [reasonable] doubt. No evidence at all. Only words.... Second-

hand info is not enough. If you remain silent[,] we all walk. If you talk, you do time alive and at large on me. [sic] If you take the stand, we cut up a truck and nothing more.

Despite Smith's references to cutting up the truck, and despite Smith's admonition to "stop talking about it to your roommate", Brown claimed that this note was not meant for him. Brown asserted that Smith wrote the note to Dennis Johnson, and that his only role was to deliver the message. Nevertheless, before Brown forwarded this note to Johnson, he added his own addendum to the back of the note:

> Hey, this is me. Don't talk to anybody about [this] shit at all. There's people in here that are trying to get information about our case so that they can make a deal for themselves. Don't f[uck] it up, please. Just got to be quiet. My lawyer said [that] if we don't take the witness stand and [we] shut up the talk, we'll be out of this mess in a few weeks. Maybe four or six months, whatever. But we've got to keep our talk down. So, f[uck], man, don't say shit to anyone at all, ever.... I'm the only one who has said shit to anyone. Just do that, please.
>
> P.S. No phone talk, please.

After Brown testified, the State called Daniel Moore in rebuttal. Moore confirmed that Brown had asked him to get rid of some truck parts. According to Moore, Brown said that the truck parts "had something to do with Harold Enzler". Brown gave Moore directions for finding the vehicle parts and, using those directions, Moore led the state troopers to the parts.

### (c) Judge Link's finding that Brown participated in the murders

After considering this testimony, Judge Link declared: "[From] all the evidence in front of me, ... I don't think it matters whether the burden of proof is ... 'clear and convincing evidence' or 'beyond a reasonable doubt'[.] Mr. Brown knew about this murder before he went out there, and [he] participated to the extent of luring Nancy Bellamy and Harold Enzler out there."

Judge Link stated that he based this conclusion on the "totality of [the] evidence", but he placed primary emphasis on the two notes—the original note written by Smith, and the addendum written by Brown himself:

> *The Court:* [Brown] piggy-backed on Smith's note and told Johnson not to talk, and [he] asked Moore to help destroy evidence. I think actions speak louder than words.
>
> [Smith's note states:] "There is no evidence of a crime because a crime did not take place." Mr. Brown knew ... that was false. "They are in Mexico, alive and at large." Mr. Brown knew that was false.... "There was no crime. A death did not occur. There is no evidence of a crime. No proof." Mr. Brown knew all those things were untrue.... "We cut up a truck in a shop, that's all. We do not know whose truck it was or where it came from." Also untrue.... "Stop talking about it to your roommate.... We can beat this.... Stop telling your cellmate. You were not there because it never happened."
>
> And to that note, and in that context, Mr. Brown then wrote [his own note] to Mr. Johnson. [In his note, Mr. Brown says:] "Hey, this is me. Please don't talk to anybody about shit at all.... Don't fuck up, please. Just got to be quiet.... [W]e've got to keep our talk down or we're fucked. Man, don't say shit to anyone, [not] to anyone at all.... I'm the only one who has said shit to [any] one. Just do that, please."
>
> In that context, that note shows to me, and confirms, ... knowledge of the crime ... of murder on Mr. Brown's part, and his participation in it.

Based on his conclusion that Brown was an accomplice to the homicides, Judge Link found that the State had proved aggravator (c)(10)—that Brown's conduct was among the most serious within the definition of the offense of tampering with evidence.

### (d) Applying the Hamilton rule to Brown's case

■ Because Brown pleaded no contest to tampering with evidence, he could not deny his guilt of this offense for sentencing purposes.[9] However, to prove the aggravator (c)(10), the State sought to prove that Brown was also an accomplice to the murders. Brown was free to dispute this allegation, and he did so by taking the stand at the sentencing hearing.

■ When a defendant denies the State's allegations of other crimes under oath and submits to cross-examination, the State can no longer rely on normal hearsay sources (such as a pre-sentence report) to prove its sentencing allegations. Rather, under the rule announced in *Hamilton v. State* [10], the State must either (1) present its witnesses in court or (2) prove that its witnesses are unavailable and that the circumstances tend to confirm the veracity of the witnesses' hearsay accounts [11].

Brown argues that because he took the stand and denied his complicity in the murders, Judge Link was legally bound to ignore the version of the homicides described in the pre-sentence report. Brown further contends that, if the pre-sentence report is ignored, the State presented insufficient evidence to establish aggravator (c)(10) by clear and convincing evidence.[12]

To evaluate Brown's argument, we must assess exactly what the State alleged and what Brown denied when he took the stand.

The State alleged that Brown was guilty of murder because, knowing that Smith intend-

---

9. *See Ashenfelter v. State,* 988 P.2d 120, 123 (Alaska App.1999); *Scott v. State,* 928 P.2d 1234, 1237–38 (Alaska App.1996).

10. 771 P.2d 1358 (Alaska App.1989).

11. *See Ashenfelter,* 988 P.2d at 125–26; *Hamilton,* 771 P.2d at 1362–63.

12. At sentencing and in its brief to this court, the State has repeatedly asserted that it was obliged to prove Brown's complicity in the murder by a "preponderance of the evidence". This is mistaken. The State was trying to prove aggravator (c)(10). Aggravators and mitigators must be proved by "clear and convincing evidence". AS 12.55.155(f). The same burden applies when an aggravator is being offered to justify a first felony offender's sentence under the *Austin* rule. *See* AS 12.55.125(k)(2).

ed to kill Enzler and Bellamy, Brown agreed to lure the two victims to an agreed-upon remote location where Smith could accomplish the murders, and Brown then did as he agreed.

Brown did not deny that Billy Smith murdered Enzler and Bellamy. Nor did Brown deny that he (Brown) brought Enzler and Bellamy to their fatal meeting with Smith. Instead, Brown denied that he acted with the two culpable mental states required to make him an accomplice to the murders. That is, Brown denied knowing that Smith intended to kill Enzler and Bellamy, and he denied that he acted with the intent of promoting or facilitating the murders.[13]

There were six main sources of evidence bearing on the question of Brown's mental state at the time of the homicides:

(1) Billy Smith's statement to the police that he recruited Brown as a co-conspirator and that Brown agreed to lure Enzler and Bellamy to the spot where Smith would kill them;

(2) The events of the murder itself—the fact that Brown drove Enzler and Bellamy to the remote location, and the fact that Smith, after killing Enzler and Bellamy, did nothing to hurt Brown even though Brown was a witness to the double homicide;

(3) Brown's actions following the murder—the fact that Brown drove Enzler's truck away from the murder scene and hid it, and that he later cut the truck into parts, painted the parts, and scattered them;

(4) Smith's actions after he, Brown, and Johnson were accused and jailed—the fact that Smith treated Brown as a trusted accomplice, sending him the note that counseled silence and asking him to forward the note to Dennis Johnson;

(5) Brown's actions with respect to this note—the fact that Brown acted like a trusted accomplice when he received Smith's note: he added his own addendum to the note, reemphasizing Smith's message, and then he forwarded the note to Johnson; and

(6) Brown's attempt to have Danny Moore destroy incriminating evidence—the fact that

Brown solicited Danny Moore to retrieve the truck parts and destroy them.

When Brown took the stand at his sentencing hearing, he disputed the first and last of these sources of evidence. First, Brown disputed Smith's statement to the police. Brown testified that he never agreed to help Smith commit the murders and that he did not know that Smith planned to kill Enzler and Bellamy. Brown declared that Smith was lying when he told the police otherwise. Second, Brown disputed Danny Moore's statement that Brown had asked him to retrieve the truck parts and destroy them. Brown conceded that he had spoken to Moore about the truck parts and had given Moore directions about where to find them. But Brown contended that he never asked Moore to destroy this evidence; instead, Brown asserted that he wanted Moore to locate the truck parts so that this evidence could be turned over to the authorities.

Brown's testimony triggered the *Hamilton* rule: the State and Judge Link could no longer rely on the pre-sentence report's description of Smith's statement to the police, or the pre-sentence report's description of Moore's statement to the police, unless (a) the State produced Smith and Moore as witnesses at the sentencing hearing, or (b) the State showed (1) that Smith and Moore were not available as witnesses, and (2) that circumstances demonstrated the trustworthiness of their statements.

As described above, after Brown finished his testimony, the State produced Danny Moore as a witness at the sentencing hearing. Moore testified that Brown had in fact solicited him to retrieve and destroy the truck parts. Thus, with respect to Moore's testimony, the *Hamilton* rule was satisfied.

■ But Billy Smith was not called as a witness. If the State wished to rely on Smith's statement to the police, the State had to show that Smith was not available as a witness and that the circumstances demonstrated the truth of his out-of-court statement.

**13.** *See* AS 11.16.110(2).

Judge Link made no explicit findings on these two issues. However, from the record, it appears that both *Hamilton* requirements were met. Smith was not available as a witness: he stood charged with murder, he was awaiting trial, and he would undoubtedly assert his privilege not to testify. And the record leaves no doubt that Judge Link believed that the other circumstances of the case—that is, the five other sources of evidence bearing on Brown's mental state—convincingly demonstrated the veracity of Smith's statement to the police.

In other words, even though Judge Link made no explicit *Hamilton* findings, the record demonstrates that the two prongs of the *Hamilton* test were met. We therefore conclude that Judge Link could properly rely on the pre-sentence report's account of Smith's statement to the police.

■ Moreover, even assuming that Judge Link committed error under *Hamilton,* that error was harmless. Even if the judge could not rely on Smith's statement to the police as a ground for establishing Brown's complicity in the murder, the other five sources of evidence remained available to Judge Link. This remaining evidence strongly supported the inference that Brown was an accomplice to the murders of Enzler and Bellamy.

True, Judge Link never explicitly disavowed reliance on Smith's statement to the police. But the judge never mentioned Smith's statement when he explained why he concluded that Brown was an accomplice to the murders. Rather, Judge Link concentrated on the other evidence—in particular, the fact that Brown's actions following the murder, and his actions in jail, strongly belied his claims of innocence and duress.

The judge specifically noted that, if Brown had been acting under duress or coercion as he claimed, Brown could have turned himself in at any time—but he did not do so. Even after Brown was indicted for murder, he did not go to the authorities and tell them that he only participated in covering up the homicides because of Smith's threats to himself

and his family members. Instead, Brown tried to get Danny Moore to destroy evidence of the crime, and Brown also willingly aided Smith's efforts to convince Dennis Johnson to say nothing to the authorities—by forwarding Smith's note to Johnson, and by adding a note of his own. Judge Link emphasized that he viewed this note as crucial evidence of Brown's guilt: "In [this] context, that note shows to me, and confirms, [Brown's] knowledge of the ... murder ... and his participation in it."

■ Even without Smith's statement to the police, the evidence strongly supports Judge Link's conclusion that Brown was guilty of murder and that, therefore, the State had proved aggravator (c)(10).[14] For this reason, we alternatively conclude that any potential *Hamilton* error was harmless.

*Brown's claim that his sentence is excessive*

Brown pleaded no contest to two acts of tampering with evidence—transporting the truck engine to a hiding place, and then later disposing of the engine in another place. Because these crimes are class C felonies, and because aggravator (c)(10) was proved, Brown potentially faced a sentence of up to 5 years' imprisonment on each of the two counts.

But despite Judge Link's finding that Brown's crimes were motivated by his complicity in the underlying murders, Judge Link did not sentence Brown to the maximum terms. Rather, the judge sentenced Brown to consecutive sentences of 5 years with 2½ years suspended on each count. That is, Brown's composite sentence is 10 years' imprisonment with 5 years suspended—5 years to serve.

Brown attacks this sentence on two bases:

First, Brown contends that his sentence violates the *Austin* rule because Judge Link violated the *Hamilton* rule when he found aggravator (c)(10). We have just held that Judge Link did not violate the *Hamilton* rule and that the judge properly found aggravator (c)(10). We therefore reject Brown's argu-

---

**14.** *See Lepley v. State,* 807 P.2d 1095, 1099 n. 1 (Alaska App.1991) (a sentencing judge's findings concerning the existence of aggravating and miti-

gating factors are reviewed under the "clearly erroneous" standard).

ment that his sentence violates the *Austin* rule.

Next, Brown contends that he should not have received consecutive sentences because, even though he pleaded no contest to two separate counts, his crimes amounted to a single continuing criminal episode—a continuing attempt to get rid of the incriminating evidence.

 Judge Link found that these two acts of tampering with evidence occurred at different times. Moreover, although the judge recognized that both offenses involved the same societal interest, he concluded that the totality of the circumstances—the seriousness of Brown's total criminal activity—justified consecutive sentences.

When this court reviews a composite sentence imposed for two or more criminal convictions, we assess whether the combined sentence is clearly mistaken, given the whole of the defendant's conduct and history.[15] Moreover, because our decision is based on the defendant's conduct as a whole, we do not require that each specific sentence imposed for a particular count or offense be individually justifiable as if that one crime were considered in isolation.[16] Given Judge Link's finding that Brown is actually guilty of two murders, his decision to impose a composite 5 years to serve is not clearly mistaken.

We note that Judge Link expressly considered whether to impose a sentence exceeding 5 years' imprisonment. The judge concluded that, given Brown's prior good record and Brown's recent steps toward rehabilitation, he could not make a *Mutschler* finding—a finding that the public safety required a sentence of greater than 5 years' incarceration.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

**15.** *See Neal v. State,* 628 P.2d 19, 21 n. 8, 22 (Alaska 1981); *Comegys v. State,* 747 P.2d 554, 558–59 (Alaska App.1987).

**16.** *See Waters v. State,* 483 P.2d 199, 202 (Alaska 1971); *Jones v. State,* 765 P.2d 107, 109 (Alaska App.1988); *Comegys,* 747 P.2d at 558–59.