Justin A. STARKWEATHER, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9296.

Court of Appeals of Alaska.

Dec. 10, 2010.

---

Sharon B. Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Tamara E. de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

Justin A. Starkweather appeals his convictions for burglary, theft, sexual assault, attempted murder, and first-degree assault, stemming from an attack on a woman in Soldotna in 2002. In our previous decision in this case, *Starkweather v. State*, Alaska App. Memorandum Opinion No. 5506 (August 19, 2009), 2009 WL 2568545, we rejected all of Starkweather's allegations of pre-trial error and trial error except one. The exception was Starkweather's claim that the superior court should have ordered the district attorney's office to disclose the prosecutor's handwritten notes of a pre-trial interview between the prosecutor and a potential witness, Fred Bahr Jr.

When Starkweather requested production of these notes, the prosecutor objected, but the prosecutor turned the notes over to the superior court for an *in camera* review. The

superior court reviewed the prosecutor's notes and concluded that they contained nothing discoverable, but the court preserved the notes (under seal) for purposes of any later appeal.

In our prior decision, we concluded that most of the prosecutor's notes were non-discoverable under Alaska Criminal Rule 16(b). *Starkweather,* Memorandum Opinion at 15, 2009 WL 2568545 at *7–8. See *Sivertsen v. State,* 963 P.2d 1069, 1071 (Alaska App.1998), where we held that Criminal Rule 16(b)(1)(A) does not require prosecutors to disclose oral statements that a witness makes during a trial preparation interview.

However, the prosecutor's notes included descriptions of two statements that Bahr attributed to Starkweather. As we noted in our prior opinion, Criminal Rule 16(b)(1)(A)(ii) requires the State to disclose "the substance of any oral statements made by the accused". Thus, even though the State was not required to disclose most of the prosecutor's interview notes, the State *was* required to disclose the substance of Starkweather's two out-of-court statements (as related by Bahr). *Starkweather,* Memorandum Opinion at 15–16, 2009 WL 2568545 at *8–9.

Because of this discovery violation, we remanded Starkweather's case to the superior court for consideration of two issues: (1) whether Starkweather was otherwise alerted to the existence of the two statements and, if not, (2) whether Starkweather was prejudiced by the non-disclosure of the two statements. *Id.* at 18, 2009 WL 2568545 at *9. (And, because we remanded Starkweather's case to the superior court, we did not resolve the issues that he raised regarding his sentencing.)

The superior court has now issued findings regarding the two non-disclosed statements, and the parties have filed supplemental briefs. These supplemental briefs address the superior court's findings, and Starkweather also raises several claims of error concerning the procedures that the superior court followed during the remand litigation.

*Starkweather's argument that the superior court should have called the trial prosecutor to the stand as part of the remand litigation*

On remand, Starkweather's attorney asked the superior court to hold an evidentiary hearing for a single purpose: calling the trial prosecutor to the stand so that she could be interrogated under oath.

The defense attorney told the superior court that she wished to interrogate the prosecutor concerning her initial failure to disclose the two statements that Fred Bahr attributed to Starkweather—specifically, to determine whether the prosecutor acted in good faith or bad faith. In addition, Starkweather's attorney told the superior court that she wished to interrogate the prosecutor concerning the circumstances of her interview with Fred Bahr, the exact content of Bahr's descriptions of Starkweather's statements during that interview, and Bahr's tone of voice when he related these statements. In particular, the defense attorney stated that she wished to investigate whether the two statements that Bahr attributed to Starkweather had actually been made by Starkweather—that is, whether Bahr personally heard Starkweather make these two statements, or whether Bahr was only relating what someone else told him about Starkweather's statements.

Finally, Starkweather's attorney also told the superior court that she wished to investigate whether the prosecutor's notes conveyed "the entirety of the discoverable information given by Bahr".

Superior Court Judge Charles T. Huguelet (the judge who presided over the remand litigation) declined to order the trial prosecutor to testify under oath. Instead, Judge Huguelet concluded that Starkweather's concerns were already answered by the existing record.

With regard to whether the trial prosecutor acted in good faith when she initially failed to disclose her handwritten notes of her pre-trial interview with Bahr, Judge Huguelet pointed out that the prosecutor had not hidden or destroyed the interview notes, but had instead produced the notes for inspection when she was directed to do so by

Superior Court Judge Charles K. Cranston (the original trial judge in Starkweather's case). Judge Huguelet also pointed out that the prosecutor openly asserted that the notes were not discoverable, and that Judge Cranston reached the same conclusion after examining the notes *in camera*.

(To this, we would add that, with the exception of the two statements that Bahr attributed to Starkweather, this Court reached the same conclusion in our earlier decision in this case: that is, we held that, with the exception of the two statements attributed to Starkweather, the prosecutor's notes were not discoverable.)

Starkweather argues that it was impossible for Judge Huguelet to reach any firm conclusion concerning the prosecutor's good or bad faith without placing the prosecutor under oath and subjecting the prosecutor to cross-examination. We do not agree. Given the circumstances here, and given this Court's prior decision in *Sivertsen*, 963 P.2d at 1071 (where we held that a prosecutor normally need not disclose their notes of a trial preparation interview with a witness), there is nothing in the record to indicate that the prosecutor acted in bad faith—eventhough she was mistaken with respect to the portion of her notes that contained the descriptions of Starkweather's two out-of-court statements. Judge Huguelet could reasonably conclude that putting the prosecutor on the stand would amount to nothing more than a fishing expedition.

Starkweather's attorney's alternative rationale for interrogating the prosecutor was to flesh out the circumstances of her interview with Fred Bahr, to determine the exact content of Bahr's descriptions of Starkweather's statements during that interview, and to hear the prosecutor's testimony regarding Bahr's tone of voice when he related these statements.

It appears that a substantial portion of this information—specifically, the particular questions put to Bahr by the prosecutor, and the prosecutor's observations or impressions concerning Bahr's demeanor during the interview—is protected by the work product privilege. Moreover, as we have already explained, we held in *Sivertsen* that a prosecu-

tor normally does not need to disclose the contents of a trial preparation interview with a witness.

With respect to the suggestion that, during Bahr's interview with the prosecutor, he might have described other statements made by Starkweather, the record again contains no indication of this. The prosecutor's notes contain only the two statements that we described in our first opinion in Starkweather's case. And, as we noted in our earlier opinion in this case, when Judge Cranston directed the prosecutor to answer (as an officer of the court) whether her notes omitted any significant statement made by Bahr during the interview, the prosecutor answered, "Nothing." *Starkweather*, Memorandum Opinion at 12, 2009 WL 2568545 at *6.

In short, there is nothing to suggest that Bahr attributed any other statements to Starkweather during the interview. Again, Judge Huguelet could reasonably conclude that the defense attorney was merely fishing, and that nothing would be gained by putting the prosecutor under oath to have her repeat what she had already told Judge Cranston in open court—to wit, that her notes of the interview contained everything of substance that Bahr said.

This leaves Starkweather's contention that cross-examination of the prosecutor was required so that Starkweather's attorney could investigate the possibility that Bahr might not have personally heard Starkweather make the two statements at issue—the possibility that Bahr was only relating what someone else told him about Starkweather's statements. But this was already clear from the record.

As Judge Huguelet noted in his findings, the defense received independent disclosure of one of the statements that Bahr attributed to Starkweather: Starkweather's purported statement to his girlfriend, Melissa Larson, "I just did something bad, and it's your fault because you wouldn't come and talk to me." The independent disclosure of this statement is contained in the notes and transcript from an interview of Bahr conducted by Investigator James Truesdell on March 21, 2002, and

a follow-up interview of Melissa Larson conducted by Truesdell on April 4, 2002.

In Bahr's police interview, Bahr reported that *Melissa Larson told him* that Starkweather told her that "he fucked up, he did something wrong, and he needed to talk to her". And in Truesdell's follow-up interview with Larson, she stated that Starkweather made this statement to her (although she described Starkweather's words slightly differently).

In other words, Judge Huguelet could reasonably conclude that it was clear, from the existing record, that Bahr did *not* personally hear Starkweather make this statement, and that Bahr's only knowledge of the statement came from talking to Larson.

With regard to the second statement that Bahr attributed to Starkweather—"Bring [Larson] back or I will kick your ass"—Judge Huguelet did not make an explicit finding as to whether Bahr personally heard this statement. However, from Bahr's description of Starkweather's words, it is apparent that Bahr described this statement as having been made directly to him by Starkweather (over the telephone). Indeed, Starkweather's defense attorney actively argued that this was the case—*i.e.*, that when Starkweather made this statement, he was speaking directly to Bahr. The defense attorney argued that this incident showed, among other things, that Bahr and Starkweather were acquainted (and that Bahr was lying when he claimed that he did not know Starkweather).

In sum, Judge Huguelet could reasonably conclude that it was unnecessary to have the prosecutor take the stand to describe her understanding as to whether Bahr personally heard Starkweather utter the two statements that Bahr attributed to him.

For all of these reasons, Judge Huguelet could reasonably conclude that it was unnecessary to make the prosecutor take the stand and be cross-examined about any of the topics suggested by Starkweather. Thus, Judge Huguelet did not abuse his discretion when he declined to order the prosecutor to take the stand during the proceedings on remand.

*The question of whether Starkweather was prejudiced by the State's initial failure to disclose the two statements that Bahr attributed to Starkweather*

■ We now reach the question that we directed the superior court to investigate during the remand proceedings: whether the investigation or presentation of Starkweather's defense might have been prejudiced by the prosecutor's failure to disclose the two statements that Bahr attributed to Starkweather.

As we have already explained, Judge Huguelet found that the first of these statements—Starkweather's purported statement to his girlfriend, Melissa Larson, "I just did something bad, and it's your fault because you wouldn't come and talk to me."—had already been independently disclosed to the defense. This statement is described in Investigator Truesdell's notes and transcripts of his interview with Bahr on March 21, 2002, and his follow-up interview with Melissa Larson on April 4, 2002.

Although Starkweather, in his supplemental brief, declares that he was prejudiced by the prosecutor's failure to disclose Bahr's two "statements" (*i.e.,* referring to the statements in the plural), Starkweather concedes that the first statement was independently disclosed to the defense before trial, and Starkweather's supplemental brief contains no argument that he was prejudiced by the prosecutor's failure to disclose this first statement.

This leaves the second statement attributed to Starkweather by Bahr: Starkweather's purported statement to Bahr (over the phone), "Bring [Larson] back or I will kick your ass." Judge Huguelet found that this statement was not otherwise disclosed to the defense, but the judge also concluded that this statement was cumulative of other statements made by Starkweather and his family that *were* disclosed to the defense.

When Judge Huguelet declared that the second statement was cumulative of other evidence disclosed to the defense, the judge was apparently referring to Investigator Truesdell's interviews with Starkweather and his parents.

During Truesdell's interview with Starkweather, Starkweather indicated that he had been worried about Melissa Larson's welfare because "[t]his guy Freddie [*i.e.*, Bahr] [had] basically been keeping her away from home and stuff. Even [Larson's] mom called me, all crazy, wondering about her." Starkweather told Truesdell that he asked Larson whether "everything [was] cool with this guy, ... because I was going to go track this guy down and beat him up and shit."

During Truesdell's interview with Starkweather's parents, Starkweather's father told him that he overheard his son talking to someone on the telephone. According to Starkweather's father, his son "actually kind of threw a threat [to this person] on the phone." The elder Starkweather described his son as saying, "You need to let this girl go, or I'm either going to come over there, or I'm gonna call the police or, you know—I mean, stuff's gonna happen." Starkweather's mother immediately added that her son also said, "I need to talk to her."

In his supplemental brief to this Court, Starkweather argues that Bahr's description of Starkweather's threatening statement ("Bring [Larson] back or I will kick your ass.") was important to the defense case because this statement "corroborate[d] Starkweather's and [Starkweather's] parents' statements that Starkweather was ... threatening Bahr that night." But as Judge Huguelet noted in his findings on remand, Starkweather's angry and threatening behavior toward Bahr "does not seem to have been seriously in dispute [at Starkweather's trial]."

The record supports Judge Huguelet's observation. At Starkweather's trial, both sides relied on the fact that Starkweather was upset with Bahr—although the two sides asked the jury to draw different inferences from this fact. In the prosecutor's summation to the jury, the prosecutor relied on the evidence that Starkweather was growing increasingly angry over the fact that his girlfriend, Melissa Larson, was running around with Fred Bahr—and the prosecutor reminded the jury that Starkweather stated that he was thinking about doing something violent to Bahr. Likewise, Starkweather's defense

attorney asked the jury to consider the fact that "[Starkweather] and Fred [Bahr] have had words. Fred won't let him talk to Melissa, and they're mad at each other." The defense attorney then argued that Starkweather's angry behavior toward Bahr might have prompted Bahr to frame Starkweather for the crimes committed in this case. The defense attorney rhetorically asked the jury, "Is that a motive for Fred to set [Starkweather] up? That very well could be."

In a separate argument, Starkweather asserts that the threatening statement, "Bring her back or I will kick your ass," was important evidence because it showed that Starkweather and Bahr knew each other. But as Judge Huguelet noted, even if Starkweather told Bahr, "Bring her back or I will kick your ass," this statement does not show that Starkweather and Bahr knew each other.

Moreover, as Judge Huguelet also noted, both Starkweather and Bahr told the police that, while they were aware of each other's existence, they were not acquainted with each other.

In Starkweather's interview with the troopers on February 2, 2002, he described how Melissa Larson had been running around with a guy named "Freddie". When Trooper Sgt. Barry Wilson asked Starkweather, "Who's Freddie?", Starkweather answered, "I don't know Freddie. ... I just know his name, and [I've] got his [telephone] number right there, because I've been trying to get ahold of [Larson]." A little later in the same interview, Starkweather told the troopers, "I got out of jail [and] found out that [Larson had] been off on the run with some guy or something. ... [And] I was trying to get ahold of them, [and] they knew [it]. This dude was fucking-all saying stuff to me, and ... [he] [w]ouldn't let me talk to [Larson]—this Freddie guy."

And in Fred Bahr's interview with the troopers on March 21, 2002, he stated (with regard to Starkweather) that he "never met the dude. I don't know who this dude is."

The testimony presented at Starkweather's trial further corroborated the fact that Starkweather and Bahr were not acquainted. In her trial testimony, Melissa Larson said that

she did not think she had ever introduced Bahr to Starkweather. Larson's mother testified that, because of her concern about her daughter, she asked Starkweather what he knew about Fred Bahr, and Starkweather told her that he did not know anything about him.

For these reasons, we agree with Judge Huguelet that Starkweather failed to identify any plausible way in which he was prejudiced by the prosecutor's failure to disclose the two statements that Bahr attributed to Starkweather. Accordingly, we now reject Starkweather's claim that he is entitled to a new trial because of the non-disclosure of these statements.

*Whether Starkweather could properly receive separate convictions and sentences for attempted murder and first-degree assault arising from the same criminal conduct*

■ Based on the assault on M.B., Starkweather was indicted for attempted first-degree murder[1] and for first-degree assault. (The first-degree assault count of the indictment alleged three separate theories: intentionally causing serious physical injury, recklessly causing serious physical injury by means of a dangerous instrument, and inflicting serious physical injury under circumstances manifesting extreme indifference to the value of human life).[2] The jury found Starkweather guilty of both charges.

During the sentencing proceedings, Starkweather argued that he should not receive separate convictions and sentences for both attempted murder and first-degree assault—that the superior court should, instead, enter one merged conviction based on the attempted murder verdict and the first-degree assault verdict. Judge Cranston rejected this argument, relying on this Court's unpublished opinion in *DeJesus v. State*, Alaska App. Memorandum Opinion No. 4044 (May 5, 1999), 1999 WL 272423.

In *DeJesus*, the defendant argued that he should not receive separate convictions and sentences for attempted murder and second-degree assault arising from the same inci-

dent—that entering separate convictions for these two related crimes would violate Alaska's guarantee against double jeopardy as interpreted by the Alaska Supreme Court in *Whitton v. State*, 479 P.2d 302, 310 (Alaska 1970). This Court rejected the defendant's argument and affirmed the entry of separate convictions for these two offenses:

> When we analyze the separate crimes at issue, we note that there is a significant difference in the interests protected [by] each [criminal statute]. [The] [a]ttempted first-degree murder [statute] penalizes a substantial step undertaken with the intent to kill another. No [infliction of] injury ... is required for this crime. On the other hand, for the crime of second-degree assault as charged in this case, the defendant's conduct must have caused injury to another by means of a dangerous instrument. We consider that difference between the two crimes to be substantial and [we] conclude that multiple sentences are authorized.

*DeJesus*, Memorandum Opinion at 15–16, 1999 WL 272423 at *6.

In the present appeal, Starkweather argues that our analysis of this question in *DeJesus* should not govern his case. He argues that the facts of his case are significantly different from the facts presented in *DeJesus*—and that, under the facts of his case, a *Whitton* analysis points to a merger of the two offenses because "the [first-degree] assault was ... part and parcel of the attempted murder".

Starkweather's argument is premised on the assumption that, under *Whitton*, the question of whether the verdicts on two or more offenses merge into a single conviction hinges on the particular details of the defendant's conduct. This is incorrect. We expressly rejected this view of *Whitton* in *Erickson v. State*, 950 P.2d 580 (Alaska App. 1997).

The defendant in *Erickson* argued that *Whitton* called for "case-specific double jeopardy rulings", as opposed to rules of general application that apply to all defendants con-

---

**1.** AS 11.41.100(a)(1)(A).

**2.** AS 11.41.200(a)(1), (a)(2), and (a)(3).

victed of particular pairs or groupings of offenses.[3] We acknowledged that "[s]ome of the language used [by the supreme court] in *Whitton* supports [this] interpretation of the decision"—for example, the passage in *Whitton*, 479 P.2d at 312, where "the supreme court called on trial judges to assess whether significant differences in intent or conduct are revealed by 'the facts of the case'." [4]

However, when we examined *Whitton* and all of the supreme court's subsequent double jeopardy decisions applying *Whitton*, we concluded that the supreme court "has consistently treated double jeopardy issues as questions of law". *Id.* at 585. That is, "the [supreme] court has decided these issues *de novo*, using statutory analysis, rather than reviewing trial court decisions for abuse of sentencing discretion under the particular facts of the defendant's case." [5]

Adhering to our decision in *Erickson*, we reject Starkweather's argument that the answer to his double jeopardy claim rests on an examination of the particular facts of his case.

However, this still leaves the question of whether our ruling in *DeJesus* was correct. Are the offenses of attempted murder and first-degree assault sufficiently distinct so that, when they arise from a single criminal episode, a defendant should receive a separate conviction and sentence for each offense?

For purposes of determining whether separate convictions and punishments may be imposed for separate statutory offenses arising out of the same conduct, the federal double jeopardy test and the Alaska double jeopardy test are seemingly different.

In *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983), the United States Supreme Court declared that, in this context, the federal double jeopardy clause "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." In other words, under the federal double jeopardy test, the question of whether the law permits separate convictions and punishments is answered by ascertaining whether the legislature intended to allow separate convictions and punishments. In *Todd v. State*, 917 P.2d 674, 677 (Alaska 1996), the Alaska Supreme Court acknowledged that this is the federal rule.

However, in *Todd*, the Alaska Supreme Court suggested that the *Whitton* rule requires a different analysis, separate from ascertaining the legislature's intent. In other words, the supreme court suggested that the double jeopardy clause of the Alaska Constitution may restrict the authority of the legislature to punish a defendant for separate statutory offenses arising from the same criminal conduct, even when the legislature clearly wishes to authorize separate punishments. *Todd*, 917 P.2d at 681–83.

The supreme court did not actually have to decide in *Todd* whether the Alaska double jeopardy clause limits the authority of the legislature to divide a single criminal occurrence into separately punishable offenses. And, given the way the supreme court applied the *Whitton* test in *Todd* (and has applied *Whitton* in other cases), there is some reason to believe that the Alaska double jeopardy test is actually closer to the federal test than it might appear. *See Cronce v. State*, 216 P.3d 568, 572–73 (Alaska App.2009) (Mannheimer, J., concurring).

However, for purposes of deciding Starkweather's appeal, we will assume that the Alaska double jeopardy test—*i.e.*, the *Whitton* test—is more expansive than its federal counterpart. Accordingly, to answer the question of whether Alaska law allows separate convictions for both attempted murder and first-degree assault arising from the same criminal conduct, we will first analyze this question under the narrower federal double jeopardy test: what did the legislature intend? A separate *Whitton* analysis will only be needed if we conclude that the legislature intended to permit separate convictions.

---

**3.** *Id.* at 584.

**4.** *Ibid.*

**5.** *Ibid.*

As we are about to explain, we have examined the legislative history of the statutory provision prescribing the punishment for attempted murder. We conclude, from this legislative history, that the legislature did not intend to have defendants convicted and punished separately for both attempted murder and first-degree assault when an attempted murder results in serious physical injury to the victim. Rather, the nature and extent of the victim's injuries are factors that a sentencing judge will consider when assessing the defendant's term of imprisonment within the broad sentencing range for attempted murder (10 to 99 years' imprisonment).

The pertinent legislative history begins in 1978, when the Alaska legislature enacted our current criminal code. In that original version of the criminal code, the Alaska statute defining attempts—AS 11.31.100—declared that an attempt to commit murder was a class A felony. *See* former AS 11.31.100(d)(1) (1978).[6] This meant that the punishment for attempted murder was 0 to 20 years' imprisonment.[7]

Ten years later, in 1988, legislation was proposed to increase the punishment for attempted murder. *See* House Bill 371 (15th Legislature). When House Bill 371 came before the House Health, Education, and Social Services Committee for hearing on March 15, 1988, the Committee was told that the proposed increased punishment for attempted murder was intended to close a "loophole" that existed under the current statute for defendants who engaged in conduct that would have been murder except that, by sheer luck, the victim did not die.[8] Assistant Attorney General Stephanie Joannides (speaking on behalf of the Department of Law in support of the bill) explained that the crime of attempted murder encompassed a wide range of conduct and accompanying results—from attempts to kill that failed completely, to attempts to kill in which "the

[victim] might be so injured that they might as well be dead".[9]

During Ms. Joannides's testimony, one of the Committee members (Representative Nilo Koponen) asked her "if people [were to be] charged [with,] and sentenced for, both attempted murder and assault." Ms. Joannides replied, "Whichever situation can be proved by the prosecutor, but never both charges at the same time." [10]

Three weeks later, on April 8, 1988, Ms. Joannides testified in support of the bill before the House Judiciary Committee. By that time, Judiciary Committee staff had prepared two alternative versions of the bill.

One version would have made the penalties for attempted murder the same as the penalties for first-degree sexual assault. At that time, the maximum penalty for first-degree sexual assault was 30 years' imprisonment, with specified presumptive terms for first, second, and third felony offenders. *See* former AS 12.55.125(i) (1988). The second version of the bill would make the penalty range for attempted murder the same as the penalty range for second-degree (unintentional) murder. At that time, the crime of second-degree murder carried a maximum penalty of 99 years' imprisonment, with a mandatory minimum of 5 years' imprisonment. *See* former AS 12.55.125(b) (1988).

Ms. Joannides urged the Judiciary Committee to adopt this second version of the bill; that is, she urged the Committee to adopt an indeterminate penalty range of 5 to 99 years for attempted murder, rather than making attempted murder subject to the rules of presumptive sentencing that governed the punishment for first-degree sexual assault. According to the minutes of the April 8th committee hearing, Ms. Joannides told the Committee:

> [Because of the rules that limit a sentencing judge's discretion under presumptive sentencing, it] would be almost impos-

---

6. SLA 1978, ch. 166, § 2.

7. AS 12.55.125(c).

8. Minutes of the House Health, Education, and Social Services Committee for March 15, 1988, Tape 1, Side 2, log no. 124.

9. *Id.*, log no. 341.

10. *Id.*, log no. 155.

sible for the court to fashion a sentence close to the maximum if [an] attempted murder was particularly terrible. Under [the second proposed version of the bill], the [sentencing] court [still] has guidelines to follow, but it also has more discretion with different scenarios—ranging from missing a shot fired [toward the victim], to deliberately torturing [the victim] with the intent to kill, but failing.

Minutes of the House Judiciary Committee for April 8, 1988, Tape 136, Side 1, log no. 130.

Two weeks later, on April 22, 1988, both Ms. Joannides and Representative Alyce Hanley—the sponsor of House Bill 371—appeared before the House Finance Committee in support of the bill.

Representative Hanley explained the reason why she proposed increasing the penalty for attempted murder. According to the minutes of the committee hearing,

> Representative Hanley [told the Committee that] the crime of attempted murder is more serious than first-degree assault, [but] currently the penalties are the same. She [informed the Committee] of [the] case of an individual who testified against an auto theft ring, and [who later sustained] serious injuries ... when his car was bombed. She said [that,] with [the current] maximum sentence of 20 years [for attempted murder], [plus credit for] good time, and ... mitigating circumstances, a [defendant convicted of this crime] could be out [of prison] in two and one-half years.

Minutes of the House Finance Committee for April 22, 1988, Tape HFC 88–65, Side 2 (no log numbers indicated).

After Representative Hanley gave this explanation of her bill, Ms. Joannides explained to the Finance Committee that because attempted murder was classified as a class A felony under the then-existing law, "the situation would have to be totally grievous for [a sentencing] court to [justify] giving a sentence of ten ... years [or more]." [11]

Ms. Joannides also expressed concern that "a maximum sentence of 30 years would [not] be sufficient" for serious cases of attempted murder.[12]

The legislature ultimately adopted the course urged by Ms. Joannides: attempted murder was re-classified as an unclassified felony with the same penalty range as second-degree murder: 5 to 99 years' imprisonment. See SLA 1988, ch. 59, § 1 (reclassifying the offense of attempted murder) and § 5 (amending the sentencing statute, AS 12.55.125(b), to include attempted murder).

To summarize the foregoing legislative history: It appears that when the Alaska Legislature re-categorized the offense of attempted murder as an unclassified felony, and when the legislature increased the penalties for this offense to a mandatory minimum of 5 years' imprisonment and a maximum of 99 years' imprisonment, the legislature's purpose was to establish a penalty range that would reflect the broad scope of conduct encompassed within attempted murder—from ineffectual attempts to kill that left the victim unharmed, to attempts that inflicted grievous injury on the victim and, by luck alone, fell short of inflicting death. In other words, the degree of harm suffered by the victim is intended to be a primary factor in determining the defendant's sentence.

This interpretation of the legislature's purpose is corroborated by the answer that Ms. Joannides gave to Representative Koponen when he asked whether defendants would be sentenced for both attempted murder and assault. As explained earlier, Ms. Joannides replied that defendants would "never [be sentenced for] both charges at the same time." In essence, Ms. Joannides told the legislators that if a defendant attacked another person with intent to kill, and in doing so inflicted injury on the victim, the defendant would only be sentenced for attempted murder and the injury would be taken into account when the court formulated the defendant's sentence.

Sixteen years ago, in *Rudden v. State*, 881 P.2d 328 (Alaska App.1994), this Court recog-

---

**11.** *Ibid.*

**12.** *Ibid.*

nized this legislative purpose behind the decision to expand the penalty range for attempted murder. We noted that this increased penalty range "appears to have been intended ... to reflect the exceptionally broad range of conduct encompassed within the definition of attempted first-degree murder", as well as "the consequent need for a correspondingly broad range of sentencing alternatives". *Id.* at 330. We explained:

> At one extreme, an attempted first-degree murder might cause no injury at all to the victim and might involve conduct falling far short of any immediate threat of deadly harm—the type of slight step beyond mere preparation that minimally qualifies as an attempt. By contrast, at the opposite extreme, an attempted first-degree murder might consist of a completed act of calculated deadly force that, through no lack of effort or intent by the offender, happens to fall slightly short of the mark, causing lasting and near-fatal injuries instead of death.

*Rudden,* 881 P.2d at 330.

We now re-affirm the conclusion we drew in *Rudden:* the wide range of penalties for attempted murder reflects the broad range of conduct encompassed within the definition of the offense, and the degree of harm suffered by the victim is a primary factor in determining the defendant's sentence.

Against this background, we now return to the question posed in Starkweather's case: does Alaska law allow separate convictions and sentences for attempted murder and first-degree assault when these separate statutory offenses arise out of the same attack on the victim?

The State argues (correctly) that the prohibition on attempts to take someone else's life is distinct from the prohibition on injuring another person. This is demonstrated by the fact that a person can attempt to kill someone but inflict no injury on them—and, conversely, a person can inflict injury on someone without any intent to kill them. Thus, the situation is more serious, and more blameworthy, when the defendant acts with intent to kill *and* inflicts injury on the victim.

But as we explained above, both the legislative history from 1988 and this Court's prior decision in *Rudden* stand for the proposition that, in cases where the State proves that the defendant acted with an intent to kill, the legislature intended for the amount or degree of injury inflicted on the victim to be a primary factor in determining the severity of the defendant's sentence within the 5–year to 99–year range codified in AS 12.55.125(b). Giving the defendant an additional, separate conviction and sentence for inflicting that injury is inconsistent with the legislature's purpose. And, as we have explained, a representative of the Department of Law explicitly told a House committee that this would *not* happen.

We accordingly conclude that, under the federal double jeopardy test announced in *Missouri v. Hunter,* it is unlawful for Starkweather to receive separate convictions for attempted murder and first-degree assault arising from the same attack. The federal double jeopardy clause protects defendants from receiving greater punishment than the legislature intended, and the entry of separate convictions in this situation is inconsistent with the legislature's intent.

In reaching this conclusion, we cast no doubt on the State's authority to separately *charge* attempted murder and first-degree assault (or some appropriate lesser degree of assault) based on the same attack. As we have noted, a charge of attempted murder does not require proof of injury, and a charge of first-degree assault does not require proof of an intent to kill. Thus, a charge of first-degree assault is not included within a charge of attempted murder. For the State to obtain a jury verdict on both alleged aspects of the defendant's conduct (whether the defendant acted with intent to kill, and whether the defendant inflicted serious physical injury), the State must charge the defendant with both crimes. However, if the jury concludes that both crimes have been proved, the superior court must merge the two verdicts into a single conviction for attempted murder.

We therefore direct the superior court to merge the jury's verdicts on attempted murder and first-degree assault into a single

conviction for attempted murder. Because Starkweather received a consecutive 5 years' imprisonment for first-degree assault, the superior court must re-sentence him.

*Starkweather's claim that his composite sentence is excessive*

■ Starkweather was convicted of four felonies: attempted first-degree murder, first-degree sexual assault, first-degree assault, and first-degree burglary. For the crime of attempted murder, the superior court sentenced Starkweather to 64 years' imprisonment with 25 years suspended—*i.e.*, 39 years to serve. The court sentenced Starkweather to consecutive sentences of 8 years' imprisonment for the sexual assault, 5 years' imprisonment for the physical assault, and 3 years' imprisonment for the burglary. Thus, Starkweather's composite sentence for these four felonies is 55 years to serve. Starkweather contends that this sentence is improperly severe.

In the previous section of this opinion, we concluded that Starkweather should not have received a separate conviction and sentence for first-degree assault, and that he must be re-sentenced. However, when the superior court re-sentences Starkweather, the superior court could conceivably increase Starkweather's sentence for attempted murder by as much as the 5 consecutive years that Starkweather received for this first-degree assault conviction. *See Allain v. State*, 810 P.2d 1019, 1021 (Alaska App.1991).

To avoid further appellate litigation of this case, we conclude that we should address Starkweather's sentence appeal now. And to address Starkweather's sentence appeal, we must describe the underlying facts of this case—because, when a composite sentence is appealed on the ground of over-severity, the appellate court's task is to assess whether the combined sentence is clearly mistaken, given the whole of the defendant's conduct and history.[13]

On February 2, 2002, a woman, M.B., was found lying on the floor of her bedroom; a dresser was resting on top of her. There was a substantial amount of blood around her vaginal area and around her head, and she had bite marks on her chest. M.B. had suffered extensive injuries to her face and to her internal organs—injuries so severe that she was hospitalized for over a year. In his trial testimony, Dr. Michael A. Todd described the extent of the injuries inflicted on M.B.:

> *Dr. Todd*: [M.B.] was the victim of an assault [notable] for its intensity and ferocity. ... [M.B.] had extensive [injuries]: her face was basically flattened, and the bones of her face were sticking out through the skin. ... Her central face was basically shattered. Both cheeks were demolished, her nose was demolished, ... the bones that form the platform for her eyes were fractured, her jaw was fractured. ... Her intestines had been smashed against her back bone and I can't—it's hard to describe what force it takes to do that, to actually take somebody's internal organs and smash them against the bones in their back. ... Her pelvis was fractured in an almost ... spectacular way. Again, an injury that someone would sustain falling from a building or being in a high-speed motor vehicle accident.

The evidence presented at trial showed that Starkweather, who was M.B.'s neighbor, broke down three different doors to get to M.B.: the external garage door, the door between the garage and the laundry room, and finally M.B.'s bedroom door. M.B. testified that she had no memory of the assault—indeed, no memory of anything until March 2003, when she woke up at Alaska Regional Hospital.

At Starkweather's sentencing, Judge Charles Cranston acknowledged that, at the time of this incident, Starkweather was a youthful offender (twenty years old) with a relatively insignificant criminal record. Nevertheless, Judge Cranston concluded that Starkweather was a worst offender for sentencing purposes, based on the extreme bru-

---

13. *See Brown v. State*, 12 P.3d 201, 210 (Alaska App.2000); *Comegys v. State*, 747 P.2d 554, 558– 59 (Alaska App.1987).

tality of the assault and the fact that Starkweather left M.B. to die.

Judge Cranston noted that Starkweather broke down several doors to reach M.B., and that he then sexually assaulted M.B. with a blunt instrument and repeatedly kicked her, inflicting severe physical injury and permanent disfigurement. The judge also noted that these crimes were "senseless" in that "there was no apparent motive for [Starkweather's] behavior". And Judge Cranston emphasized the fact that, when M.B. was nearly dead from this assault, Starkweather placed a dresser on top of her so that she would be unable to leave the room, and then he left her there to die, alone and incapacitated.

Judge Cranston also took account of Starkweather's conduct in jail during the two years since his arrest for this offense. During that time, Starkweather had threatened both inmates and corrections staff: he had already lost a total of 600 days of good time credit for assaulting a staff member in February 2002, for making threats of immediate bodily harm, and for an "individual demonstration" that threatened the safety and security of the facility. In addition, Starkweather had spent 338 days in punitive segregation for, among other things, fighting with inmates, perpetrating another assault on a staff member in September 2002, and refusing to obey direct orders of a staff member.

Based on the totality of Starkweather's conduct, and his apparent inability to control himself even in jail, Judge Cranston concluded that Starkweather "[was] a definite threat to society". Judge Cranston further concluded that, given the nature of Starkweather's conduct, the sentencing goal of rehabilitation took a lesser priority to the sentencing goals of isolating Starkweather to protect society from further violence, of expressing societal condemnation of the type of brutal crime inflicted on M.B., and of deterring others from committing such crimes.

In his sentencing remarks, Judge Cranston declared that he had studied this Court's decision in *Rudden v. State*, 881 P.2d 328. Apparently referring to the prior sentencing cases collected in footnote 2 of *Rud-*

*den*, 881 P.2d at 332, Judge Cranston stated that these cases seemed to suggest a benchmark sentencing range of 30 to 40 years to serve for attempted murder. However, Judge Cranston noted that in the *Rudden* decision itself, this Court suggested that there should be a convergence between sentences for attempted murder and sentences for completed murder when the facts of the attempt approach the seriousness of the completed crime.

(The actual quote from *Rudden* is: "As the gap between attempt and completion narrows, the justification for disparate treatment of an offender convicted of attempted murder, [as opposed to] the completed crime, ... diminishes commensurately; as the crimes grow similar, so should the sentences." 881 P.2d at 330–31.)

Judge Cranston concluded that Starkweather's case presented a situation where an attempted murder fell short of completion due, primarily, to fortuity. Another significant factor, Judge Cranston declared, was that Starkweather's prior history gave no hint of such extreme violence—that Starkweather's attack on M.B. was inexplicable and unpredictable.

Based on these factors, Judge Cranston declared that Starkweather's sentence for attempted murder should exceed the benchmark range of 30 to 40 years to serve that the judge had inferred from the footnote in *Rudden*. However, Judge Cranston then proceeded to impose a sentence *within* that range: 39 years to serve (more precisely, 64 years with 25 years suspended).

Judge Cranston then imposed the applicable 8–year presumptive term for Starkweather's offense of first-degree sexual assault, a 5–year sentence for the first-degree physical assault, and a 3–year sentence for first-degree burglary. Because Judge Cranston imposed these three sentences consecutively to the attempted murder sentence (and to each other), this brought Starkweather's composite sentence to 55 years to serve (with an additional 25 years suspended).

Because Starkweather received a sentence of 39 years to serve for the crime of attempted murder, Starkweather's case does not re-

quire us to decide whether the benchmark sentencing range for attempted murder is (or should be) the 30–to–40–year range suggested by Judge Cranston in his sentencing remarks. All we need to say on this issue is that, for the reasons identified by Judge Cranston, Starkweather's case presents an aggravated instance of attempted murder— an instance of inexplicable and horrific violence that, but for chance, would have achieved M.B.'s death. Whatever the benchmark sentencing range for typical instances of attempted murder might be, Starkweather's case is distinguishable from a typical attempted murder.[14]

When Starkweather's other two felonies— first-degree sexual assault and first-degree burglary—are added to the sentencing calculus, we readily conclude that a composite sentence of 55 years to serve is not clearly mistaken.[15] Therefore, even if the superior court decides to maintain Starkweather's current composite sentence when the superior court re-sentences Starkweather, we would affirm that sentence.

*Conclusion*

The judgement of the superior court is AFFIRMED, with the exception that the superior court must merge the guilty verdicts on the charges of attempted murder and first-degree assault into a single conviction for attempted murder, and must re-sentence Starkweather accordingly.

---

14. *Compare Hamilton v. State*, 59 P.3d 760, 772 (Alaska App.2002) ("we have repeatedly upheld sentences in the upper end of the penalty range for defendants who committed gratuitous or otherwise inexplicable acts of extreme violence"); *Harmon v. State*, 908 P.2d 434, 444 (Alaska App. 1995) (holding that a first-degree murder is ag-

gravated when the defendant tortures or inflicts gratuitous pain on the victim).

15. *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).